Whitney Ely FANNING, Appellant,

v.

Nita Kissel FANNING, Appellee.

No. 10–90–112–CV.

Court of Appeals of Texas,
Waco.

March 4, 1992.

Rehearing Denied May 6, 1992.

Pamela E. George, Houston, for appellant.

LaNelle L. McNamara, McNamara & McNamara, Waco, for appellee.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Whitney Fanning appeals the final decree of divorce in which the trial court awarded the vast majority of the Fannings' assets and the custody of their three children to Nita Fanning. Because the court failed to enforce a premarital agreement and an enforceable partition agreement, we reverse that part of the judgment divesting Whitney Fanning of title to his separate property and dividing the community property contrary to the agreement of the parties. However, we affirm that part of the judgment awarding custody of the children to Nita Fanning and ordering Whitney Fanning to pay $3,000 per month for the support of the children.

### The Premarital Agreement

Whitney Fanning and Nita Kissel entered into a premarital agreement on August 15, 1980, pursuant to section 5.41(a) of the Texas Family Code,[1] which purported to authorize premarital agreements. Both parties were practicing attorneys when the premarital agreement was executed. They were married on September 27, 1980.

In point two, Whitney Fanning contends that the trial court erred in setting aside the premarital agreement because (1) the court erroneously concluded that the agreement was unconstitutional and void, (2) the court erroneously concluded that the agreement did not operate to partition or exchange the future income from separate property or the community interest in income from personal efforts, (3) Nita Fanning failed to satisfy the burden of proof required by section 5.46 of the Texas Family Code, and (4) the evidence was legally or factually insufficient to support the court's failure to enforce the premarital agreement.

■ Paragraph six of the agreement provides:

6.01) During their marriage, all income and revenue (other than that which is part of the property itself) from the separate property of each party hereto is the community property of the parties if so defined by Texas law. However, the parties understand that the 66th Texas legislature approved H.J.R. 54, to be submitted to the voters on November 1980, by the terms of which spouses may, by agreement between themselves, provide that the income from separate property owned by either of them, or thereafter acquired, shall be the separate property of the spouse owning such separate property. If such amendment to Article XVI, Section 15, of the Texas Constitution is approved by the voters, the parties agree that as soon as legally possible all income from their respective estates shall be the separate property of the spouse from whose separate estate such income is derived.

6.02) The parties agree that each may, from time to time, designate certain banks as his or her agent to assist in carrying out this Agreement by administering accounts in the name of the respective party, by the name of the party adding "as separate property," or other-

1. "Before marriage, persons intending to marry may enter into a marital property agreement as they may desire." *Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1, 1969 Tex.Gen.Laws 2707,* 2729, *amended by* Act of June 1, 1987, 70th Leg., R.S., ch. 678, § 1, 1987 Tex.Gen.Laws 2530, 2530–32 (current version at Tex.Fam.Code Ann. §§ 5.41–.50 (Vernon Supp.1992)).

wise, to the end that all funds which are deposited to the separate accounts of the parties hereto and income therefrom will be identified as the separate property of the party in whose name such funds are held. As received, the respective parties shall deposit funds received that are the income or revenue from their respective separate property into one of their respective several or separate property accounts created in their respective and on deposit (if not before) such funds shall be the separate property of the spouse whose separate property produced such income or revenue, if so provided by this Agreement. The parties hereto hereby instruct any bank holding such funds on deposit as provided in this paragraph that such funds are the separate property of the party in whose name such deposit was made as provided in this paragraph.

### Validity of the Premarital Agreement

 When this premarital agreement was executed in August 1980, it was void to the extent that it attempted to recharacterize income or other property acquired during the marriage as separate property. *See Williams v. Williams*, 569 S.W.2d 867, 870 (Tex.1978).[2] Furthermore, income and revenue from separate property was community property because it was not acquired by "gift, devise or descent." *See* TEX. CONST. art. XVI, § 15. However, article XVI, section 15, of the Texas Constitution was amended in November 1980 to allow "persons about to marry and spouses" to partition or exchange community property "then existing or to be acquired" in the future. *Id.* The 1980 amendment also provided that "the spouses may from time to time, by written instrument, agree between themselves that the income or property from all or part of the separate

property then owned by one of them, or which thereafter might be acquired, shall be the separate property of that spouse...." TEX. CONST. art. XVI, § 15 (1980, amended 1987).[3]

The Texas Supreme Court held in *Beck* that the 1980 constitutional amendment impliedly validated section 5.41 of the Texas Family Code and all agreements entered into before November 4, 1980, pursuant to that statute. *Beck*, 814 S.W.2d at 749. In *Beck*, the parties agreed that "all the properties ... held or standing in the name of only one of them shall be considered as a separate property of the one of them in whose name such property is held or stands." *Id.* at 746. Apparently, the supreme court found that the agreement was validated by the clause authorizing the "partition ... or exchange ... of community property ... to be acquired." *See id.* at 747.

Because paragraph 6.02 of the Fannings' premarital agreement was substantially similar to the agreement upheld in *Beck*, that portion of the agreement was enforceable. Therefore, the court erred in setting aside paragraph 6.02 of the premarital agreement.

 Unlike the agreement upheld in *Beck*, however, paragraph 6.01 of the Fannings' premarital agreement deals with income from separate property, regardless of whether it was deposited into an account designated as the separate property of one of the spouses. *See id.* at 746. Although the portion of the constitutional amendment validating the partition and exchange of property "then existing or to be acquired" applies to "persons about to marry and spouses," the portion of the amendment validating written agreements concerning income or property derived from

---

**2.** *But see Beck v. Beck,* 814 S.W.2d 745, 749 (Tex.1991) (agreement entered under the 1948 amendment to article XVI, section 15, of the Texas Constitution was "voidable" rather than "void").

**3.** Non-substantive changes were made to this clause by constitutional amendment in 1987. Article XVI, section 15, of the Texas Constitution now provides, "spouses also may from time to time, by written instrument, agree between themselves that the income or property from all or part of the separate property then owned or which thereafter might be acquired by only one of them, shall be the separate property of that spouse...." TEX. CONST. art. XVI, § 15.

separate property applies only to spouses. *See* TEX. CONST. art. XVI, § 15.[4]

▮ Section 5.41 of the Texas Family Code, as it existed at the time the Fannings entered into the premarital agreement, appeared to allow persons intending to marry to enter into enforceable agreements concerning their property as they saw fit.[5] The scope of section 5.41 was addressed by the Texas Supreme Court in *Williams:*

> This statute should be construed as broadly as possible in order to allow the parties as much flexibility to contract with respect to property or other rights incident to the marriage, provided the constitutional and statutory definitions of separate and community property or the requirements of public policy are not violated.

*Williams,* 569 S.W.2d at 870.

Because the Texas Constitution remains the ultimate authority on the character of marital property, a premarital agreement entered into pursuant to section 5.41 may not violate the constitutional definitions of separate and community property. *See Arnold v. Leonard,* 273 S.W. 799, 802 (Tex. 1925). We note that the Texas Supreme Court in *Beck* addressed only the retroactive application of the 1980 amendment, rather than the scope of premarital agreements authorized by that amendment. *See Beck,* 814 S.W.2d at 748.

The 1980 amendment did not authorize persons intending to marry to enter into agreements that the income from one

spouse's separate property would thereafter be the owner's separate property.[6] Therefore, we hold that the trial court correctly concluded that paragraph 6.01 of the premarital agreement was unenforceable to the extent the parties merely agreed that "as soon as legally possible all income from their respective separate estates shall be the separate property of the spouse from whose estate such income is derived."

▮ According to section 5.44 of the Texas Family Code, "A premarital agreement becomes effective on marriage." TEX.FAM.CODE ANN. § 5.44 (Vernon Supp. 1992). As a result, some commentators have suggested that, by statutory definition, a premarital agreement is between spouses who are authorized to enter into agreements concerning income or property derived from separate property.[7] However, the constitutional distinction between partition and exchange agreements and agreements concerning income from separate property cannot be redefined by the legislature. *See Arnold,* 273 S.W. at 802. Therefore, section 5.44 provides no basis for validating paragraph 6.01 of the premarital agreement.

▮ Arguably, a premarital agreement could partition or exchange income from separate property as property to be acquired in the future.[8] However, the language of paragraph 6.01 indicates that the parties were not contemplating a partition or exchange of property to be acquired during the marriage. Instead, paragraph

---

4. This constitutional distinction between partition and exchange agreements and agreements concerning income from separate property was reflected by the 1981 and 1987 amendments to the Texas Family Code, enacted by the legislature to implement the 1980 amendment to article XVI, section 15, of the Texas Constitution. Although section 5.53 of the Texas Family Code authorizes agreements between spouses concerning income or property derived from separate property, the Texas Uniform Premarital Agreement Act does not expressly authorize such an agreement between "prospective spouses." *See* TEX.FAM.CODE ANN. §§ 5.41–.50, 5.53 (Vernon Supp.1992).

5. *See* Cameron, Hoffman & Ytterberg, *Marital and Premarital Agreements,* 39 BAYLOR L.REV. 1095, 1101–02 (1987).

6. *See* Featherston & Springer, *Marital Property Law in Texas: The Past, Present and Future,* 39 BAYLOR L.REV. 861, 884 (1987).

7. *See* Mercing, *The Uniform Premarital Agreement Act: Survey of its Impact in Texas and Across the Nation,* 42 BAYLOR L.REV. 825, 844 (1990).

8. Section 5.41 of the Texas Family Code, as amended in 1987, defines property as "an interest, present or future, legal or equitable, vested or contingent, in real or personal property, *including income and earnings.*" TEX.FAM.CODE ANN. § 5.42(2) (Vernon Supp.1992) (emphasis added).

6.01 expressly refers to the portion of the 1980 amendment that authorized agreements concerning income or property derived from separate property. Because they were clearly attempting to implement the portion of the 1980 amendment that applied only to spouses, we hold that paragraph 6.01 was not validated by the constitutional amendment authorizing the partition and exchange of property to be acquired in the future. Therefore, the income from separate property remained community property unless otherwise recharacterized by a valid provision of the premarital agreement or an enforceable partition agreement executed during the marriage. As in *Williams,* the invalid provision is severable from the valid portions of the agreement because the invalid provision does not constitute the agreement's main or essential purpose. *See Williams,* 569 S.W.2d at 871.

■■■■■ Paragraph two of the premarital agreement provided that the property described in Schedule A "is and shall remain the separate property of Future Husband," and that the property described in Schedule B "is and shall remain the separate property of Future Wife." The "incomes and revenues from Whitney E. Fanning practice of law" were designated as his separate property. Likewise, "all incomes derived from future Wife's law practice" were designated as her separate property. In *Huff v. Huff,* 554 S.W.2d 841, 842–44 (Tex.Civ.App.—Waco, 1977, writ dism'd), this court held that section 5.41 of the Texas Family Code authorized such an agreement. Furthermore, as a partition or exchange of property to be acquired in the future, this agreement was impliedly validated by the 1980 constitutional amendment. *See* TEX. CONST. art. XVI, § 15. Therefore, the court erred in finding that during the marriage all income earned by Whitney Fanning in the practice of law was

community property. The court also erred in concluding that the provision of the premarital agreement providing for the exchange of future earnings from the practice of law was "unconstitutional and therefore void at the time of its execution." However, to the extent that either spouse earned income from personal efforts other than the practice of law, the court correctly concluded that the premarital agreement, "did not operate to partition and/or exchange the community property interests in the parties' income from personal efforts."

■■■■ In point five, Whitney Fanning argues that the court erred in refusing to make an equal division of the community property. Paragraph ten of the premarital agreement provides:

In the event the parties marriage is dissolved by divorce or annulment by any court, wherever located, each party is to retain his or her separate estate as his or her separate property following the dissolution. *All community property is to be divided equally between the parties according to its value.* To effectuate this provision, Future Husband and Future Wife relinquish and disclaim any right they may have to seek a division of their property other than in accordance with this paragraph, and agree to indemnify the other for the value of any property that may be awarded by a court in excess of the value that would result if division were in accordance with this paragraph.

(Emphasis added).

In determining the validity of paragraph ten, we again construe the former section 5.41 of the Texas Family Code [9] "as broadly as possible in order to allow the parties as much flexibility to contract ..., provided the constitutional and statutory definitions of separate and community property or the requirements of public policy are not violated." *See Williams,* 569 S.W.2d at 870.

---

9. Section 5.43(a)(3) of the Texas Family Code now authorizes parties to a premarital agreement to contract with respect to "the disposition of property on separation [or] marital dissolution...." TEX.FAM.CODE ANN. § 5.43(a)(3) (Vernon Supp.1992). However, as in *Beck,* 814 S.W.2d at 746, we apply the law in effect at the time the agreement was executed. The retroactive application of sections 5.46 and 5.55 of the Texas Family Code is distinguishable because the enforcement provisions of the statute are procedural in nature. *See* TEX.FAM.CODE ANN. §§ 5.46, .55 (Vernon Supp.1992).

Article XVI, section 15, of the Texas Constitution provides that "the portion or interest set aside to each spouse shall be and constitute a part of the separate property and estate of such spouse or future spouse." TEX. CONST. art XVI, § 15. By definition, a partition or exchange of community property results in the recharacterization of community property. Because an agreement to equally divide the community property involves the disposition of community property upon dissolution rather than the recharacterization of community property as separate property, the 1980 amendment to the constitution does not appear to authorize such an agreement. However, article XVI, section 15, also authorizes the legislature to more clearly define "the rights of the spouses, in relation to separate and community property...." *Id.* This is exactly what the legislature was attempting to do in the former section 5.41 of the Texas Family Code, as well as in the Uniform Premarital Agreement Act, which replaced section 5.41 in 1987. Therefore, paragraph ten of the premarital agreement was constitutionally authorized by section 5.41.[10]

An agreement to equally divide community property also appears to encroach upon the trial court's statutory duty to "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party...." *See* TEX.FAM.CODE ANN. § 3.63(a) (Vernon Supp.1992). However, because section 5.41 had more clearly defined "the rights of the parties," the trial court, according to section 3.63(a), must give "due regard" to the terms of a pre-

marital agreement authorized by the constitution. *See* TEX. CONST. art. XVI, § 15; TEX.FAM.CODE ANN. § 3.63(a) (Vernon Supp. 1992). Therefore, the court erred to the extent that it failed to equally divide any community property of the parties.

*Enforceability of the Premarital Agreement*

■ The court expressly found that "[o]n or about August 15, 1980, the parties executed an Agreement in Contemplation of Marriage." However, the court did not find that the agreement was executed involuntarily or that it was unconscionable. *See* TEX.FAM.CODE ANN. § 5.46 (Vernon Supp.1992). Because Whitney Fanning requested additional findings of fact related to the court's failure to enforce the premarital agreement, the judgment may not be supported upon appeal by a presumed finding that the agreement was unenforceable under section 5.46. *See* TEX.R.CIV.P. 299.

The premarital agreement, with the exception of paragraph 6.01, was both valid and enforceable. Because, the trial court erred in setting the premarital agreement aside, points two and five are sustained.

## The Partition Agreements

Whitney and Nita Fanning executed partition agreements on August 14, 1981, and May 14, 1986, pursuant to section 5.42 of the Texas Family Code,[11] which purported to authorize the partition or exchange of community property. Each partition agreement recharacterized property listed on attached exhibits as the separate property of the designated spouse. In points one and

---

**10.** Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1, Tex.Gen.Laws 2707, 2729, (amended 1987).

**11.** When the 1981 partition was executed, section 5.42(a) of the Texas Family Code provided: "At any time, the spouses may partition between themselves, in severalty or in equal undivided interests, all or any part of their community property. They may exchange between themselves the interest of one spouse in any community property for the interest of the other spouse in other community property. A partition or exchange must be in writing and subscribed by both parties." Act of June 2, 1969, 61st Leg., R.S., ch. 888, § 1, 1969 Tex.Gen.Laws 2707, 2729, *amended by* Act of May 22, 1981, 67th

Leg., R.S., ch. 782, § 2, 1981 Tex.Gen.Laws 2964, 2965. When the 1986 partition was executed, section 5.42 of the Texas Family Code provided: "At any time, the spouses may partition or exchange between themselves any part of their community property, then existing or to be acquired, as they may desire. Property or a property interest transferred to a spouse by a partition or exchange agreement becomes his or her separate property." Act of May 22, 1981, 67th Leg., R.S., ch. 782, § 2, 1981 Tex.Gen.Laws 2964, 2965, *amended by* Act of June 1, 1987, 70th Leg., R.S., ch. 678, § 1, 1987 Tex.Gen.Laws 2530, 2531–32 (current version at TEX.FAM.CODE ANN. § 5.52 (Vernon Supp.1992)).

three, Whitney Fanning contends that the court erred in setting aside the 1986 partition agreement and in refusing to enforce the 1981 partition agreement.

*Validity of the Partition Agreements*

The court concluded that neither partition agreement operated "to partition and/or exchange the community property interest in future income from the separate estates of the parties." In fact, neither partition agreement provides "that the income or property from all or part of the separate property then owned or which thereafter might be acquired by only one of them, shall be the separate property of that spouse." *See* TEX. CONST. art XVI, § 15.

However, both of the partition agreements provide that:

There shall be from this day no community property interest in the above described real and personal property and we shall each hold the above described real and personal property as our sole and separate property in the manner indicated to the exclusion of the other spouse.

This provision extended the partition and exchange of the property listed on the attached exhibits to property "to be acquired" in the future, as authorized by the 1980 constitutional amendment. *See* TEX. CONST. art. XVI, § 15. Therefore, as in *Beck*, the future income from the separate-property assets listed on the attached exhibits remained the separate property of the designated spouse. *See Beck*, 814 S.W.2d at 746.

The court also concluded that neither partition agreement operated "to partition and/or exchange the community property interest in the parties' income from personal efforts." Although such an agreement was authorized by the 1980 constitutional amendment, as the partition or exchange of community property "to be acquired" in the future, neither partition agreement attempted to recharacterize the parties' income from personal efforts as separate property. *See* TEX. CONST. art XVI, § 15.

The 1986 partition agreement designated Whitney Fanning's law practice as his sep-

arate property. However, because the 1986 partition agreement did not expressly designate the income from his law practice as his separate property, the court correctly concluded that neither partition agreement operated to partition or exchange the community-property interest in the parties' income from personal efforts. *See Dewey v. Dewey*, 745 S.W.2d 514, 517 (Tex.App.—Corpus Christi 1988, writ denied). This is of little consequence, however, because the premarital agreement had previously effected a partition or exchange of the community-property interest in the primary source of the parties' income from personal efforts—"all incomes and revenues from [the] Whitney E. Fanning practice of law."

*Enforceability of the Partition Agreements*

The court concluded as a matter of law that the 1986 partition agreement was unconscionable. The court also found that:

Prior to the execution of the Partition Agreement dated May 12, 1986, Nita Kissel Fanning was not provided a fair and reasonable disclosure of the property or financial obligations of the other party; and Nita Kissel Fanning did not voluntarily and expressly waive, in writing, the right to disclosure of the property or financial obligations of the other party beyond the disclosure provided; and Nita Kissel Fanning did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

Whitney Fanning argues that the evidence was legally or factually insufficient to support the court's conclusion of law that the agreement was unconscionable or the court's findings of fact related to the disclosure of property or financial obligations. Concisely stated, Whitney Fanning contends that Nita Fanning failed to carry her burden of proof under section 5.55 of the Texas Family Code. Section 5.55 provides that:

(a) A partition or exchange agreement is not enforceable if the party against whom enforcement is sought proves that:

(1) that party did not execute the agreement voluntarily; or

(2) the agreement was unconscionable when it was executed and, before execution of the agreement, that party:

(A) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party;

(B) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the party beyond the disclosure provided; and

(C) did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.

(b) An issue of unconscionability of a partition or exchange agreement shall be decided by the court as a matter of law.
TEX.FAM.CODE ANN. § 5.55 (Vernon Supp. 1992).

 In response, Nita Fanning argues that section 5.55 does not apply to the 1986 partition agreement. Prior to September 1, 1987, the enforcement of marital agreements was governed by section 5.45.[12] When the legislature amended the Texas Family Code in 1987, it did not expressly provide that the amendatory provisions should be given retrospective application. However, the general rule is that, in the absence of an express intention to the contrary, legislation dealing with a procedural matter applies to pending litigation to the extent that subsequent steps in the case are to be taken under the new rule. *Brooks v. Texas Employers Ins. Ass'n*, 358 S.W.2d 412, 414 (Tex.Civ.App.—Houston 1962, writ ref'd n.r.e.). Section 5.55 simply sets forth the revised procedural scheme for challenging the enforceability of a partition or exchange agreement. Therefore, Nita Fanning had the burden of proof under section 5.55 because the provisions of former section 5.45 no longer applied. *See Daniel v. Daniel*, 779 S.W.2d 110, 113 (Tex.App.—Houston [1st Dist.] 1989, no writ).

Although section 5.55(b) provides that the issue of unconscionability shall be decided by the court as a matter of law, the legislature and the courts have not defined "unconscionable" in the context of marital-property agreements. *See* TEX.FAM.CODE ANN. § 5.55(b) (Vernon Supp.1992). Instead, the issue of unconscionability must be addressed on a case-by-case basis, looking to the entire atmosphere in which the agreement was made. *See Pearce v. Pearce*, 824 S.W.2d 195, 199 (Tex.App.—El Paso, 1991, no writ). In *Chiles v. Chiles*, 779 S.W.2d 127, 129 (Tex.App.—Houston [14th Dist.] 1989, writ denied), the court held that a factual finding that an agreement was unfair to one spouse did not satisfy the burden of proof required by the statute.

In *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex.Civ.App.—Texarkana 1975, no writ), the court addressed unconscionability of a contract under section 2.302 of the Texas Business and Commerce Code:

In determining whether a contract is unconscionable or not, the court must look to the entire atmosphere in which the agreement was made, the alternatives, if any, which were available to the parties at the time of the making of the contract; the non-bargaining ability of one party; whether the contract is illegal or against public policy, and, whether the contact is oppressive or unreasonable. At the same time, a party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts.... A contract is not unenforceable on the ground that it yields a return disproportionate to the expenditures in time and money, where there has been no mistake or unfairness and the party against whom it is sought to be enforced has received and enjoyed the benefits.

As in *Wade*, we will focus upon the circumstances at the time the agreement was executed rather than the disproportionate effect of the agreement. *See id.* Mr. Fanning testified that severe marital problems

12. Act of May 22, 1981, 67th Leg., R.S., ch. 782, § 2, 1981 Tex.Gen.Laws 2964, 2965, *amended by* Act of June 1, 1987, 70th Leg., R.S., ch. 678, § 1, 1987 Tex.Gen.Laws 2530, 2531–32 (current version at TEX.FAM.CODE ANN. § 5.55 (Vernon Supp. 1992)).

developed in April and May 1986. On the night before the agreement was signed, Mrs. Fanning had played tennis as a substitute in a mixed-doubles tennis league. When she returned home, Mr. Fanning would not talk to her, and he was "pouting." She testified that, when she asked him what was wrong, he expressed his concern about going to prison in connection with a criminal investigation against the district attorney of McLennan County. According to Mrs. Fanning, her husband wanted to make sure that she did not take all the money he had accumulated and "run off with someone else" while he was in prison—a possibility that he envisioned because she had played tennis with another man that night.

Mrs. Fanning testified that Mr. Fanning assured her that he would never use the agreement against her; and that he threatened to divorce her and take the children if she did not sign the partition agreement. At that time, Mr. Fanning had won ten consecutive custody cases for fathers. Because Mrs. Fanning considered his threats to be valid, she believed that her only alternative was to sign the agreement. *See Matthews v. Matthews*, 725 S.W.2d 275, 279 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (threatening to permanently deprive spouse of custody of the children constituted duress in the execution of a partition agreement).

That night, Mr. Fanning got out of bed and went to his law office to prepare the partition agreement. He called her the next day and told her to come to the office to sign the agreement. Although she remembered signing the partition agreement, she did not remember signing the accompanying deeds. She testified, however, that she would have signed whatever he put in front of her that day. A witness called by Mrs. Fanning testified that Mr. Fanning "just doesn't take no for an answer." According to the witness, when Mr. Fanning "wants to do something, he wants to do it and he wants to do it his way." Even the psychologist who testified on Mr. Fanning's behalf characterized him as manipulative and that, given his competitiveness, his manipulative tendencies, and his aggression, "he could get very angry and be retaliatory."

Considering the circumstances, the alternatives, and Nita Fanning's bargaining ability, we hold that the court did not err in concluding that the 1986 partition agreement was unconscionable when it was executed. Next, we must determine if the evidence is legally or factually sufficient to support the court's findings related to the disclosure of Mr. Fanning's property or financial obligations.

■ On direct examination, Mrs. Fanning testified that "[a]t no time did [she] have a disclosure nor did [she] waive in writing any disclosure, which [she] since learned was a requirement." She believed that her husband wanted to keep her "ignorant of everything for [her] own protection" during the criminal investigation against the district attorney. She also testified that, because the district attorney's house had been searched, her husband was afraid that their house would be searched and that there was no safe place in Waco to keep anything.

Mrs. Fanning also testified that she did not have any knowledge of how much money was in an account, how much money her husband was making, or how much property he actually owned. Furthermore, Mr. Fanning's own psychologist described him as secretive. We find the evidence legally and factually sufficient to support the court's findings related to Mr. Fanning's failure to disclose his property or financial obligations. Therefore, we overrule point of error one.

■ The court expressly found that "[o]n or about August 14, 1981, the parties executed a Partition Agreement." However, the court did not find that the 1981 partition agreement was executed involuntarily or that it was unconscionable. *See* TEX.FAM.CODE ANN. § 5.55 (Vernon Supp. 1992). Because Whitney Fanning requested additional findings of fact related to the court's failure to enforce the 1981 partition agreement, the judgment may not be supported upon appeal by a presumed finding

that the agreement was unenforceable under section 5.55. *See* TEX.R.CIV.P. 299.

The 1981 partition agreement was both valid and enforceable. Because the trial court erred in refusing to enforce the 1981 partition agreement, point three is sustained.

### Divestiture of Separate Property

In point four, Whitney Fanning contends that the trial court's failure to enforce the premarital agreement and the partition agreements resulted in the divestiture of his separate property. Because the court correctly concluded that the 1986 partition agreement was unenforceable, we will limit our discussion to any divestiture resulting from the court's failure to enforce the premarital agreement and the 1981 partition agreement. Although trial courts have a broad latitude in the division of the marital community property, that discretion does not extend to a taking of the fee title to the separate property of one spouse and its donation to the other spouse. *Eggemeyer v. Eggemeyer*, 554 S.W.2d 137, 142 (Tex.1977). Separate property may, however, be set aside to assure compliance with an order for child support. *Id.;* TEX.FAM.CODE ANN. § 14.05(a) (Vernon Supp.1992).

In amended findings of fact, the court found that "[a]ll property not specifically listed as separate property in these Findings of Fact is community property of the parties." Although assets valued at approximately $50,000 were listed as Nita Fanning's separate property, nothing was listed as Whitney Fanning's separate property. In an amended conclusion of law, the trial court concluded that a divestiture of Whitney Fanning's interest in the assets awarded to Nita Fanning was "a just and fair division of the assets of the parties." The court awarded Nita Fanning at least a fifty-percent interest in a number of assets that appear to have been recharacterized as Whitney Fanning's separate property by the premarital agreement and the 1981 partition agreement. Some of the assets recharacterized by agreement as his separate property, such as "all retirement and pen-

sion accounts in his name," were expressly awarded to Nita Fanning by the trial court. However, it is unclear from the divorce decree whether certain other assets awarded to Nita Fanning are the same as or traceable to similar assets recharacterized by agreement as Whitney Fanning's separate property. Because the court's failure to enforce the premarital agreement and the 1981 partition agreement resulted in the divestiture of his separate property, we sustain point of error four with regard to the property recharacterized by those two agreements. On remand, the court must determine the character of the assets according to the valid and enforceable agreements of the parties. As in *Eggemeyer*, however, the trial court is also instructed to determine whether any further arrangements for the support of the children should be made pursuant to section 14.05 of the Texas Family Code. *See Eggemeyer*, 554 S.W.2d at 142; TEX.FAM.CODE ANN. § 14.05 (Vernon Supp.1992).

Because our disposition of points two through five requires a reversal and remand regarding the property division, we do not reach points six and seven, which are related to the court's just and right division of community property.

### Breach of Fiduciary Duty

In point eight, Whitney Fanning contends that the trial court erred in finding that he breached his fiduciary duty and that Nita Fanning suffered damage in the amount of $245,000. He argues that these findings were not supported by legally or factually sufficient evidence, or that they were based upon erroneously admitted hearsay evidence. The court filed the following findings of fact related to a breach of fiduciary duty:

Whitney Ely Fanning breached his fiduciary duty to his wife by diverting community assets for the use and benefit of his paramour and her family and by disposing of community money without the consent of Nita Kissel Fanning and to her detriment.

Whitney Ely Fanning breached his fiduciary duty to his wife by disposing of

and/or secreting significant community assets, to-wit: a certificate of deposit in the Cayman National Bank and Trust Company Limited, in the approximate amount of $295,000.

Nita Kissel Fanning has suffered damage in the amount of $245,000 as a result of the breach of Whitney Ely Fanning's fiduciary duty.

 The courts have taken a dim view toward gifts by the husband to "strangers" of the marriage, "particularly of the female variety." *Spruill v. Spruill,* 624 S.W.2d 694, 697 (Tex.App.—El Paso 1981, writ dism'd). Constructive fraud is the breach of a legal or equitable duty, which the law declares fraudulent because it violates a fiduciary relationship. *Carnes v. Meador,* 533 S.W.2d 365, 370 (Tex.Civ. App.—Dallas 1975, writ ref'd n.r.e.). Such a trust relationship exists between a husband and wife with regard to the community property controlled by one spouse. *Id.* Thus, a presumption of constructive fraud arises when a spouse unfairly disposes of the other spouse's interest in community property. *Id.* The burden of proof is, therefore, upon the disposing spouse to prove the fairness of the disposition of the other spouse's one-half community ownership. *Id.*

Mr. Fanning testified that in April 1987 he wrote a check in the amount of $13,000 that "probably would have been for the down payment" on a house purchased by his paramour, Carol Villareal. Mrs. Fanning identified this as one of the checks missing from the documents produced by her husband prior to trial. Mr. Fanning also acknowledged that, in December 1987, he wrote a $3,000 check to Villareal for cosmetic surgery. He described the check as a bonus resulting from her employment with his law practice. However, Mrs. Fanning testified that, at about the same time, her husband told her they could not afford treatment recommended by her orthodontist and that Mr. Fanning refused to agree to pay for it. Mr. Fanning took Villareal to Mexico in 1987 and to Jamaica in 1989. He also testified that in 1988 he gave $6,000 to Villareal's mother for the purchase of an automobile. In *Mazique v. Mazique,* 742 S.W.2d 805, 807–08 (Tex.App.—Houston [1st Dist.] 1987, no writ), the court held that similar evidence was legally and factually sufficient to support the trial court's award of damages for constructive fraud.

 Mr. Fanning also admitted that he contributed $40,000 to charitable organizations several months prior to trial. Property possessed by either spouse during marriage is presumed to be community property. TEX.FAM.CODE ANN. § 5.02 (Vernon Supp.1992). He testified that all gifts were made out of separate property, but he failed to rebut the community-property presumption by offering clear and convincing evidence tracing the property and its mutations back to his separate estate. *See Scott v. Scott,* 805 S.W.2d 835, 837 (Tex. App.—Waco 1991, writ denied). Although one spouse may make moderate gifts of community property for just causes, excessive or capricious gifts made with intent to defraud the other spouse may be set aside as a constructive fraud. *Hartman v. Crain,* 398 S.W.2d 387, 390 (Tex.Civ.App.— Houston 1966, no writ). One of Whitney Fanning's secretaries testified that Mr. Fanning mailed a significant sum of money to a number of charities during the summer of 1989. She also testified that Mr. Fanning's other secretary obtained a list of charities from the library and that each of the secretaries was responsible for addressing two hundred envelopes. We hold that the trial court rightfully could have considered the circumstances and timing of the charitable contributions in finding that such a disposition of community funds was unfair to the rights of Nita Fanning.

 Mrs. Fanning testified that her husband made cash withdrawals from his personal account totaling $94,850 in 1987 and $50,050 in 1988 and the court admitted other evidence of significant cash withdrawals from his personal and office accounts. Although property possessed by either spouse during marriage is presumed to be community property, this presumption may be rebutted by clear and convincing evidence tracing the property and its mutations back to a spouse's separate es-

tate. *Scott,* 805 S.W.2d at 837; TEX.FAM. CODE ANN. § 5.02 (Vernon Supp.1992). Because the court had previously concluded that the premarital agreement was unconstitutional and void, the court assumed that the funds in Whitney Fanning's personal and office accounts were community property. However, because the premarital agreement had recharacterized "accounts in the name of the respective party" as separate property, no fraud on the marital estate would have resulted from the disposition of funds from a bank account in his name.

■ Over Whitney Fanning's hearsay objection, the court admitted into evidence copies of two deposit slips reflecting a certificate of deposit in a Cayman Island bank. Mrs. Fanning testified that the funds in the Cayman Island account were from her husband's law practice. Again, the court erroneously concluded that these funds were community property. Because the premarital agreement effectively recharacterized the income from Whitney Fanning's law practice as his separate property, he owed no fiduciary duty to his wife with regard to the funds on deposit in the Cayman Island account. It is, therefore, unnecessary to address the hearsay complaint.

We hold that there is legally and factually sufficient evidence to support the court's finding that Whitney Fanning breached his fiduciary duty by "diverting community assets for the use and benefit of his paramour," and by "disposing of community assets without the consent" of Nita Fanning. However, there is no evidence to support a finding of a breach of fiduciary duty with regard to funds withdrawn from bank accounts in Whitney Fanning's name or the certificate of deposit in the Cayman Island bank. As a result, the court's award of damages is excessive. Therefore, we sustain point of error eight in part and remand for the trial court to determine the amount of community funds disposed of unfairly by Whitney Fanning.

### Custody and Support of the Children

■ Whitney Fanning contends in point nine that the trial court erred in ordering

him to pay child support in the amount of $3,000 per month. He argues that the evidence is legally or factually insufficient to support the child-support order; that the trial court abused its discretion because the child-support order is manifestly unfair and unjust; and that the child-support award ignores the support guidelines in section 14.055 of the Texas Family Code. *See* TEX. FAM.CODE ANN. § 14.055 (Vernon Supp. 1992).

Section 14.055(c) requires the court to apply the percentage guidelines of section 14.055(b) to the first $4,000 of the obligor's net resources; and, without further reference to the percentage guidelines, "the court may order additional amounts of child support as proven, depending on the needs of the child at the time of the order." *Id.* at § 14.055(c).

The court found that the amount of net resources available to the Whitney Fanning was $19,000 per month. Section 14.053(b) states that net resources for the purpose of determining child support liability are:

> 100 percent of all wage and salary income and other compensation for personal services (including commissions, overtime pay, tips, and bonuses), interest, dividends, royalty income, self-employment income (as described in Subsection (c) of this section), net rental income ..., and all other income actually being received, ... less (subtracting) 100 percent of social security taxes, federal income tax withholding for a single person claiming one personal exemption and the standard deduction, union dues, and expenses for health insurance coverage for the obligor's child.

*Id.* at § 14.053(b).

Section 14.053(c) defines self-employment income:

> Income from self-employment, whether positive or negative, includes benefits allocated to an individual from a business or undertaking in the form of a proprietorship ... less ordinary and necessary expenses required to produce that income, but may exclude amounts allowable under federal income tax law as depreciation, tax credits, or any other

business expenses shown by the evidence to be inappropriate to the determination of income for the purpose of calculating child support.

*Id.* at 14.053(c).

Whitney Fanning argues that, because his testimony established that he netted $200,000 in 1989, the court's finding that he had net resources of $19,000 per month is not supported by the evidence. The Fannings' 1987 federal income tax return, which was the most recent tax return admitted into evidence, reflected a net profit of $337,382 from his law practice. However, the Fannings also suffered a one-time loss of $115,058 from the closing of a clothing store operated by Nita Fanning from May to December 1987. Therefore, their net business income for 1987 was $222,324. Consequently, Whitney Fanning argues that the court used the wrong figure for calculating his net resources.

However, because section 14.053(b) defines net resources as one-hundred percent of self-employment income, less social security taxes and federal income-tax withholding, the court properly calculated Whitney Fanning's net resources without considering the loss from the clothing store. *See id.* at § 14.053(b). Therefore, we hold that the court's finding that he had net resources of $19,000 per month is supported by legally and factually sufficient evidence.

■ We also find legally and factually sufficient evidence to support the child-support award of $3,000 per month. The court found that the children have enjoyed "a high standard of living including expensive toys, vacations, entertainment, private school, etc., and would in all likelihood continue this standard of living were it not for the divorce of the parties." The court provided the following reasons for ordering additional amounts of child support:

(1) The Obligor makes in excess of $4,000 per month; and

(2) Child support based on only the first $4,000 of Obligor's income is unreasonably low given the prior life-style of the children, the present needs of the chil-

dren, and the great disparity in earning capacity of the Obligor and Obligee; and

(3) Application of the 30% guideline to all of Obligor's net resources would result in a child support payment that would exceed the needs of the children; and

(4) Child support in the amount of $3,000 per month, that being 30% of the first $4,000 of Obligor's net resources and 10% of the remainder of Obligor's monthly resources, is sufficient child support to meet the needs of the children at the time of divorce.

The thirty-percent guideline does not apply to net resources in excess of $4,000 per month. *Id.* at 14.055(c). Likewise, the court's ten-percent formula for net resources in excess of $4,000 is not authorized by section 14.055(c). *See id.* Nevertheless, we find the resulting child-support award is supported by legally and factually sufficient evidence. The court admitted into evidence a schedule of household expenses prepared by Nita Fanning's accountant. Mrs. Fanning testified that the exhibit accurately reflected $1,925 in monthly expenses directly related to the needs of the children, as well as significant other household expenses that the court could have considered in determining the needs of the children. Whitney Fanning's primary complaint on appeal is that the expenses were unreasonable and had been inflated by his wife. On cross-examination, Mrs. Fanning acknowledged that one month prior to trial she had provided a list reflecting only $1,345 in monthly expenses directly related to the children. However, the trial court, as the sole judge of the credibility of the witnesses, apparently believed her explanation for the discrepancy—that the original list was based on incomplete information. *See General Motors Corp. v. Grizzle,* 612 S.W.2d 275, 278 (Tex.Civ.App.—Waco 1981, no writ). Point of error nine is overruled.

■ In point ten, Whitney Fanning contends that the court erred in requiring him to issue an automatic draft, to post bond, and to make the child support an obligation of his estate. However, section 14.05(a) of the Texas Family Code provides that the

court may order either parent to make periodic payments "in the manner and to or for the benefit of the persons specified by the court in the decree." TEX.FAM.CODE ANN. § 14.05(a) (Vernon Supp.1992). Furthermore, when withholding from earnings is unworkable or inappropriate under existing circumstances (such as self-employment), section 14.42 authorizes the court to order the obligor to execute a bond. TEX.FAM. CODE ANN. § 14.42(a) (Vernon 1986). Likewise, section 14.05(d) impliedly authorizes the court to make provisions for child support an obligation of the obligor's estate. "*Unless* otherwise agreed to in writing or *expressly provided in the decree,* provisions for the support of a child are terminated by the ... death of a parent obligated to support the child." *Id.* at 14.05(d) (emphasis added).

Therefore, the court did not abuse its discretion in ordering Whitney Fanning to issue an automatic draft, to post bond, and to make child support an obligation of his estate. Point of error ten is overruled.

■ In point eleven, Whitney Fanning contends that the court erred in ordering that all of the property "now owned or held by the parties for the parties' children is placed under the sole and exclusive control of Nita Kissel Fanning, Trustee for the children...." Although he attempts to characterize this portion of the court's order as a trustee removal governed by the Texas Trust Code, Whitney Fanning has presented no evidence to support his claim that any of the children's property was ever subject to an express trust governed by the Texas Trust Code. *See* TEX.PROP. CODE ANN. §§ 111.003, 113.082 (Vernon 1984). Furthermore, section 14.02(a) of the Texas Family Code provides that "a parent appointed as sole managing conservator of the child retains all the rights, privileges, duties, and powers of a parent to the exclusion of the other parent, subject to the rights, privileges, duties, and powers of a possessory conservator...." TEX.FAM.CODE ANN. § 14.02(a) (Vernon Supp.1992).

According to section 12.04(8) of the Texas Family Code, the parent of a child has "the power to receive and give receipt for payments for the support of the child and to hold or disburse any funds for the benefit of the child." *Id.* at § 12.04(8). Because we find no abuse of discretion in the court's order, we overrule point of error eleven.

■ In point twelve Whitney Fanning contends that the court erred in appointing Nita Fanning as the sole managing conservator of the three children because the evidence is legally or factually insufficient to support the custody award. In his brief, Whitney Fanning "recognizes not only the trial court's discretion in such matters, but also that there was perhaps some evidence to support the trial court's decision." Nevertheless, he "presents this error regarding the custody of his children because of his desire to establish, even if he does not receive a reversal, that he loves his children and has not abandoned them."

Although Whitney Fanning has waived the no evidence point, we will consider whether the custody award is supported by factually sufficient evidence. Several witnesses testified that Nita Fanning was the primary caretaker of the children. Furthermore, Mrs. Fanning testified that although her husband was a "great weekend parent," she doubted whether he was "a stable force in their lives, someone who can teach these children right from wrong." The record reflects factually sufficient evidence to support the appointment of Nita Fanning as sole managing conservator. Furthermore, the judgment of the trial court will be reversed only when it appears from the record as a whole that the court has abused its discretion. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982). We overrule point of error twelve.

### Requested Findings of Fact and Conclusions of Law

■ In point thirteen, Whitney Fanning contends that the trial court erred in refusing to make numerous requested additional findings of fact and conclusions of law. However, of the 205 additional findings he requested, many involved detailed statements of the evidence that the trial court was not required to make. *See Jackman v. Jackman,* 533 S.W.2d 361, 362

**152**

(Tex.Civ.App.—San Antonio 1975, no writ). The trial court is not required to make specific findings on every controverted issue but only on the ultimate and controlling issues. *Goren v. Goren*, 531 S.W.2d 897, 901 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ dism'd). Likewise, many of the additional requested findings were properly refused because they were directly contrary to the original findings filed by the trial court. *See Great American Reserve Insurance Co. v. Sumner*, 464 S.W.2d 212, 216 (Tex.Civ.App.—Tyler 1971, writ ref'd n.r.e.). We have reviewed the additional requested findings and find no prejudicial error or harm resulting from the trial court's refusal to make the additional findings requested. *See Graham Construction Co. v. Robert H. Pyle, Inc.*, 422 S.W.2d 485, 488 (Tex.Civ.App.—Corpus Christi 1967, writ ref'd n.r.e.). Point of error thirteen is overruled.

Accordingly, the portion of the judgment granting the divorce, awarding custody, and ordering child-support payments is severed from the property division and affirmed. *See Scott*, 805 S.W.2d at 842. The portion of the judgment related to the division of property and the breach of fiduciary duty is reversed, and that portion of the cause is remanded for the trial court to enforce the premarital agreement and the 1981 partition agreement and to reconsider the amount of damages caused by the breach of fiduciary duty.