# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00297-CV

---

**Henry Hutcherson III, Appellant**

**v.**

**Tina Hutcherson, Appellee**

---

### FROM THE 20TH DISTRICT COURT OF MILAM COUNTY
### NO. CV40919, THE HONORABLE JOHN YOUNGBLOOD, JUDGE PRESIDING

---

### O P I N I O N

Before marrying, appellant Henry Hutcherson III (Hank) and appellee Tina Hutcherson (Tina) entered into a premarital agreement (PMA), which delineated each spouse's separate property and governed the division of their marital estate in the event of divorce. Tina filed for divorce in 2021, and following a bench trial, the court entered a final divorce decree in which it dissolved the parties' marriage on the ground of insupportability, found the PMA to be valid and enforceable, and confirmed the parties' separate property. The trial court awarded Tina a $900,000 judgment against Hank as "part of the division of community property between the parties" and ordered Hank to pay $5,000 per month in spousal maintenance for a period of ten years. On appeal, Hank contends that the trial court abused its discretion by imposing the $900,000 judgment and spousal-maintenance order. We affirm in part and reverse in part the trial court's final divorce decree.

## BACKGROUND

Tina filed a divorce petition in which she requested spousal maintenance and a disproportionate share of the community estate based on claims of reimbursement and fraud on the community. The divorce was tried to the bench on November 20, 2023. Both parties testified about their marriage, their separate and community property, and how the PMA affected the community estate's development. At the time of trial, Hank and Tina had no minor children.[1]

The PMA recited that Hank and Tina had fairly disclosed their assets and liabilities to each other, that each had or "reasonably could have had adequate knowledge of the property and financial obligations of the other party," and that each "voluntarily and expressly waived in writing any right to further disclosure." Both parties were represented by independent counsel in connection with the agreement, expressed an understanding of its terms, and signed it after executing a "waiver of disclosure of financial information."[2] Under the PMA, funds deposited in the parties' joint accounts were designated community property, and the parties were required to deposit their salaries into one or more of the joint accounts. Hank's salary was defined as the lesser of "$60,000 per year" or "1/2 of the profits of Accurate, Inc.," his separate property business.

The PMA incorporated handwritten schedules listing each party's separate property; Hank's Accurate shares were expressly characterized as his separate property. All income or property generated by separate property was to retain the generating property's separate character, and the PMA specifically provided, "Monies distributed from a separate property asset,

---

[1] When Hank and Tina married, each had a child from a prior relationship. They had two children together.

[2] The copy of the Waiver of Disclosure of Financial Information included in the record was signed only by Tina.

2

such as Accurate, Inc, or any other corporations that may later be formed, which do not comprise a portion of the actual stated salary of HENRY HUTCHERSON, III, as reflected in the company books shall be separate property." Although property bought with community funds was to be designated community property regardless of whose name was on the title, any property purchased using a party's separate property wholly or as a down payment would be that party's separate property "regardless of the terms of the financing agreement, and even if the community credit is pledge."

The PMA provided that in the event of divorce, each party would receive "all separate property belonging to that party" as well as "one-half of all community assets, less community debt." The agreement made no provision regarding spousal maintenance. Hank and Tina waived reimbursement claims other than those for benefits from the community to their separate estates:

> Any payment or contributions by one of us to satisfy the debts or otherwise benefit the separate estate of the other shall not give rise to a claim for reimbursement of an interest in any property purchased by those payments unless we otherwise agree in writing. Any right of reimbursement that may arise during our marriage for payments or contributions made to the other's separate estate by the community estate shall be reimbursed.

Tina testified at trial regarding her marriage to Hank, the couple's lifestyle, and his adultery. They married on December 13, 1993. Tina had been a flight attendant for around six years when she met Hank but stopped working at his insistence in 1992 or 1993, when their first child was born. She testified that Hank "did not want [her] to work" but rather "wanted [her] to stay home with the children and family" and "to always be available, kind of at his beck and call because he wasn't really a planner." Although she and Hank discussed her returning to work once their children were in school and again in 2013, after he cheated on her, he discouraged the idea

3

and questioned the value of any financial contribution she could make, reportedly telling her, "[W]hat's that going to do for us, we fly around in private jets and first class and you want to go back to slinging drinks in the back."

According to Tina, when she and Hank married, they initially lived in an apartment with his sister, and Accurate was "just a small paint shop." The business flourished over the course of the marriage, and the couple moved into a series of large ranches purchased by Accurate in Hutto, Wimberley, and Thorndale. Hank told Tina that one of the ranches belonged to both of them and referred to another ranch as "ours." Tina and two of her children played polocrosse, an equestrian sport for which they and their horses traveled "all over the United States" and for which the two children also traveled "internationally extensively." The family frequently vacationed in Hawaii and Telluride, Colorado—often accompanied by the children's friends—and during the marriage, Tina had access to helicopters and private jets, which Hank also referred to as "ours." Tina never turned down a trip or a flight on a private jet or helicopter; she enjoyed that part of their lifestyle. In addition to the travel, Hank bought himself a new car "every thirty or fifty-thousand miles" and bought her a new Suburban every few years; he did not tell her that the vehicles were purchased in Accurate's name. Although she was not "one hundred percent" certain as to Accurate's worth, she testified that "[a]t some point, I think we saw numbers like in the 37 million range."

Tina "never questioned the finances" and did not ask if the family could afford to travel as it did; she assumed "if we were doing it then we could afford it." Asked if she and Hank discussed their "future together and what that looked like as far as property," she testified, "No, not—no, I mean, I guess it was all—we didn't have great communication as far as any of that. It was whatever he decided, that's what we did." He managed the couple's finances, and she "didn't

4

have any say so or control or knowledge of anything." She did not have access to their tax returns or bank statements and never attempted to gain access to the latter because Hank "pretty much told [her] it wasn't [her] concern." While she occasionally sold horses, she gave him the proceeds and did not know what he did with the money. She trusted him and thought that they were building a community estate and that she would be able to retire; he "always told [her] you don't have to worry about anything, you don't have to worry about anything, you will be taken care of." Had she known "the situation," she would have acted differently and would never have quit her job.

After Hank's first affair, which began around 2011 or 2012, he promised never to cheat on Tina again. However, in late 2020, she learned that he had been seeing other women and that he had purchased an expensive condo in Horseshoe Bay.

Regarding her earning potential and property, Tina explained that she was fifty-eight and that the retirement age for flight attendants at most airlines was between fifty-five and sixty-five. She graduated high school but had completed only "a little bit of college." Since her and Hank's separation, she had applied for jobs at several airlines and other businesses but had received only a single low-paying offer from an airline that wanted her to relocate to Rhode Island and that did not fly to Texas, where all of her children live. During the divorce case's pendency, she had been studying for her real estate license but had not yet completed her classes; regardless, her friend, a realtor, had told her that real estate work would not support Tina immediately because "you don't make money right away." Tina testified that as of the time of trial, she had no way of supporting herself or of meeting her minimum reasonable needs. There was no chance that she could make "any type of income that would match" the lifestyle she had enjoyed during her marriage, and the divorce had "destroyed everything" that she and her children "thought [they] would have at this point." Asked what she would have done differently had she known that Hank

5

"was building a life for himself and not [her]," she answered, "I would have never given up my career. I don't know what I could have done differently. I mean, put money aside. I just, you know, I never even had the opportunity to put money aside for a nest egg for myself."

At the time of trial, Tina was living in "a little apartment" at her parents' house; she had previously lived in a trailer at the Thorndale ranch but had to move when Hank began installing a solar farm, and she "got kicked out of the house." She received health insurance through Accurate and testified that a PPO plan would cost her between $1,200 and $2,200 per month. In a proposed support decision admitted at trial, she gave her gross monthly earnings as $0 and her monthly expenses as $10,490.00, excluding health insurance.[3] In its initial temporary orders signed on July 23, 2021, the trial court ordered Hank to pay $4,924.04 per month in spousal support. In further temporary orders on June 22, 2023, the court ordered him to pay an additional $1,500 per month "for her use towards securing new living arrangements."

Tina testified that the community estate included no real property and that her car, a ten-year-old Porsche, needed a new transmission and new brakes. She had no life-insurance policy or retirement account, and the joint checking and savings accounts in her name, which were part of the community estate, were worth approximately $14,675.16, less her credit card debt. In a sworn inventory admitted at trial, she calculated the value of the community estate at $83,518.16 and requested that she be awarded $61,009.34.

Hank's testimony largely concerned the extent of his separate property,[4] which was predominantly held by Accurate, a company he co-owned with his deceased father's living trust,

---

[3] In the expense fields next to "Health insurance" and "Dental and orthodontia," Tina wrote, "Husband pays."

[4] The characterization of Hank's separate property is not at issue on appeal.

of which he was the trustee and sole beneficiary. The joint checking and savings accounts in Hank's name—which like the joint accounts in Tina's name were community assets—had a total balance of around $3,581.12 after subtracting his credit card debt. His separate property included a traditional IRA worth $16,547.05,[5] a living trust to which he had assigned all of his personal property, and property held in Accurate's name. Among the latter were the three ranches; two condos in Horseshoe Bay, each worth more than $700,000; the furniture for all of the homes; multiple properties in Milam County, Waller County, and Williamson County; and three bank accounts with a total balance of $1,866,983.63 as of October 2023.

In 2013, Hank created a second business, H. H. Accurate Ranch, L.L.C., which was funded by Accurate and which managed expenses at the latter's properties. H. H. Accurate Ranch's only asset was a bank account with a balance of $17,829.67 as of October 2023. His father's living trust reflected an October 2023 balance of $541,015.49. It is unclear whether the helicopter and private jets used by Hank and Tina were leased or were titled in his or Accurate's name; they did not appear in either spouse's proposed property division or property inventory. In Hank's proposed disposition of issues, he valued the community estate at $20,093.23 and requested that he be awarded forty-four percent, or $8,785.52.

Eight of Hank's tax returns—from 1992, 2015, and 2017 through 2022—were admitted into evidence during trial. On four of the returns, he reported income greater than $250,000; moreover, other than 2015, he reported income over $150,000 each year. He testified that he began filing a separate return around 2012 or 2013 on the advice of his accountants after

---

[5] Hank testified that he set up an IRA for Tina with an identical balance, but no other evidence of the IRA was offered at trial. Tina testified that she was unaware of the IRA's existence.

7

learning that Tina was not reporting income generated by her horse-trading. He also testified that at the time of trial, he had a yearly salary of $62,500 because of the pandemic's impact on his industry and because Accurate was "losing money every month," leading him to "cut expenses everywhere." Yet he also acknowledged that the business had bought the Horseshoe Bay condos during the pandemic because prices were depressed and that he had continued to travel with his girlfriend.

Hank frequently used his company credit cards to pay for personal expenses as well as "things that inured to [him] and [Tina] and [their] children of a personal nature." Although he had in fact earned "well in excess of $60,000 a year"—his salary obligation under the PMA—during the marriage, he had also spent in excess of his required contribution, and Tina and the children had benefitted from his income. He and Tina had "lived a pretty world[-]traveling lifestyle." He agreed that he had managed the couple's finances, that much of their lifestyle had been funded by his separate property, and that his ability to use Accurate's funds to furnish that lifestyle was "just another perk of having a business."[6] He further testified that his intent had not been to avoid creating community property and maintained that he had not been "paying [him]self less and leaving it in the company so that [Tina] would have less."

Hank disagreed with Tina regarding her finances and employment. He testified that she was "free to work" and "had a very successful horse[-]trading business" and that he thought she had "a few bank accounts [he] didn't know about." He agreed that he had gifted her two trailers and the Porsche and elsewhere testified that she "has worked selling jewelry in multiple states. She has worked at a fashion center in Wimberl[e]y. She has had lots of income."

---

[6] Hank testified that he assiduously accounted on his taxes for personal expenses paid using Accurate's funds.

8

Asked whether he had worked with the "same drive" to build up their community estate as he had to grow Accurate, Hank answered, "I guess not." And while he agreed that he "would refer to [his] income or what [he was] building . . . as ours," he was ambiguous about any representation he had made regarding their retirement.

In the trial court's final divorce decree, it found that the PMA was "valid and enforceable as a matter of law" and granted Hank and Tina's divorce on the ground of insupportability. After finding that it was "a just and right division of the parties' marital estate, having due regard for the rights of each party," the court listed each party's separate property. The sole reference to the division of the community estate came as part of the court's award to Tina of the $900,000 judgment:

> For the purpose of a just and right division of property made in this decree, IT IS FURTHER ORDERED AND DECREED that Petitioner, Tina Hutcherson, is awarded judgment of $900,000.00 against Respondent, Henry Hutcherson, with interest at 5% percent per year compounded annually from the date of judgment, for which let execution issue. IT IS ORDERED that Henry Hutcherson shall pay said judgment by paying $50,000 by February 9, 2024 and the remaining balance by April 3, 2024. To be paid by cashier's check or wire.

> This judgment is part of the division of community property between the parties and shall not constitute or be interpreted to be any form of spousal support, alimony, or child support.

The court also ordered Hank to pay $5,000 per month to Tina as spousal maintenance until: December 31, 2033; the death of either party; Tina's remarriage; or "further orders of the Court affecting the spousal maintenance obligation, including a finding of cohabitation by Tina Hutcherson." Under a section titled "Date of Judgment," the court wrote, "This divorce heard and final orders rendered on November 20, 2023, but divorce not granted until

9

the date of the signing of this Final Decree of Divorce below." The trial court judge signed the decree on February 2, 2024.

Hank filed an untimely request for findings of fact and conclusions of law, which the trial court did not make. He filed a motion to modify the trial court's judgment and a motion for new trial, both of which were overruled by operation of law. This appeal followed.

## DISCUSSION

### I. Standard of Review

We review a trial court's division of community property and award of spousal maintenance for an abuse of discretion. *See Murff v. Murff*, 615 S.W.2d 696, 698 (Tex. 1981) (property division); *Kelly v. Kelly*, 634 S.W.3d 335, 364 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (spousal maintenance). It is an abuse of discretion for a trial court to rule arbitrarily, unreasonably, without regard for guiding rules or principles, or without supporting evidence. *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 482 (Tex. 2022).

Under an abuse-of-discretion standard, the "legal and factual sufficiency of the evidence are not independent grounds of error but instead are factors used to determine whether the trial court abused its discretion." *A.S. v. Texas Dep't of Fam. & Protective Servs.*, 665 S.W.3d 786, 795 (Tex. App.—Austin 2023, no pet.) (citing *Zeifman v. Michels*, 212 S.W.3d 582, 587 (Tex. App.—Austin 2006, pet. denied)). The reviewing court considers first whether the trial court had sufficient information on which to exercise its discretion and, if so, whether the trial court erred in its application of discretion. *Id.* (citing *Zeifman*, 212 S.W.3d at 588). "The traditional sufficiency review comes into play with regard to the first question." *T.E. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00067-CV, 2022 WL 3092885, at *8 (Tex. App.—Austin Aug. 4, 2022, no pet.)

10

(mem. op.) (citing *Zeifman*, 212 S.W.3d at 588). The court then determines whether, based on that evidence, the trial court's decision was reasonable. *A.S.*, 665 S.W.3d at 795.

In reviewing for legal sufficiency, "we view the evidence in the light most favorable to the verdict," crediting favorable evidence when a reasonable factfinder could do so and disregarding contrary evidence unless a reasonable factfinder could not. *See Pike v. Texas EMC Mgmt., LLC*, 610 S.W.3d 763, 794 (Tex. 2020). We will sustain a no-evidence challenge when (1) evidence of a vital fact is absent, (2) rules of law or evidence bar us from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Bos v. Smith*, 556 S.W.3d 293, 299–300 (Tex. 2018).

The trier of fact "is the sole judge of the credibility of witnesses and the weight to be given their testimony." *Altice v. Hernandez*, 668 S.W.3d 399, 410 (Tex. App.—Houston [1st Dist.] 2022, no pet.) (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003)). We therefore "may not pass upon the witnesses' credibility or substitute our judgment for that of the fact finder." *4922 Holdings, LLC v. Rivera*, 625 S.W.3d 316, 325 (Tex. App.—Houston [14th Dist.] 2021, pet. denied).

When the trial court conducts a bench trial but makes no findings of fact and conclusions of law, it is implied that the court made all findings necessary to support its judgment. *Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990)). If, as here, the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency. *Anderson Mill Mun. Util. Dist. v. Robbins*, 584 S.W.3d 463, 473 (Tex. App.—Austin 2005, no pet.). In

11

determining whether some evidence supports implied findings of fact, we consider only the evidence most favorable to the issue and disregard entirely any evidence to the contrary. *Worford*, 801 S.W.2d at 109.

## II.     Premarital Agreements

A PMA is "an agreement between prospective spouses made in contemplation of marriage and to be effective on marriage," Tex. Fam. Code § 4.001(1), and is distinct from a partition-and-exchange agreement (also called an interspousal or postmarital agreement), *compare id.* §§ 4.001–.009, *with id.* §§ 4.101–.106.  For purposes of a PMA, "property" is broadly defined as "an interest, present or future, legal or equitable, vested or contingent, in real or personal property, including income and earnings." *Id.* § 4.001(2).  Parties to a PMA may contract with respect to "the disposition of property on . . . marital dissolution"; "the modification or elimination of spousal support"; and "any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty." *Id.* § 4.003(a)(3), (4), (8).  The exclusive defenses against enforcement of a PMA are involuntariness and unconscionability. *See id.* § 4.006(a)–(c); *see also Sheshunoff v. Sheshunoff*, 172 S.W.3d 686, 693 (Tex. App.—Austin 2005, pet. denied) (recognizing that subsection (c) was enacted to enshrine involuntariness and unconscionability as sole available defenses against enforcement of PMA and to disclaim other common law defenses and underscoring that "the legislature has mandated" that PMAs "must be enforced unless the exclusive statutory defenses are proven").

Texas law generally favors PMAs, *In re Marriage of Sauls & Worley*, 648 S.W.3d 359, 364 (Tex. App.—Texarkana 2021, no pet.), which are interpreted like other written contracts, *In re Marriage of I.C. & Q.C.*, 551 S.W.3d 119, 122 (Tex. 2018); *see Beck*

12

*v. Beck*, 814 S.W.2d 745, 748–49 (Tex. 1991) (using terms "premarital agreement" and "contract" interchangeably). There is, however, one important difference; unlike a normal contract, a PMA must be narrowly construed in favor of the community estate. *Fischer-Stoker v. Stoker*, 174 S.W.3d 272, 278–79 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). "Texas has a 'strong public policy favoring freedom of contract' that is 'firmly embedded in our jurisprudence.'" *Marriage of I.C. & Q.C.*, 551 S.W.3d at 124 (quoting *Philadelphia Indem. Ins. v. White*, 490 S.W.3d 468, 471 (Tex. 2016)). Parties have "the utmost liberty of contracting," and when they enter a contract freely and voluntarily, the contract "'shall be held sacred and shall be enforced by [c]ourts.'" *Id.* (quoting *Gym–N–I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007)). Like all contracts, a PMA is rarely found to be unenforceable on public policy grounds. *Id.*; *see, e.g.*, *Beck*, 814 S.W.2d at 749 ("The legislature and the people of Texas have made the public policy determination that premarital agreements should be enforced. If we refuse to enforce [Husband's] and [Wife's] premarital agreement, we would thwart, rather than advance, our state's public policy enforcing these contracts.").

Neither Hank nor Tina argues that their PMA was ambiguous, and its interpretation is therefore a matter of law for this Court to review de novo. *See Marriage of I.C. & Q.C.*, 551 S.W.3d at 122. Our primary objective is to effectuate the parties' intent, as expressed in the PMA; objective manifestations of intent, not the parties' subjective intents, control. *Id.* "Unless the contract indicates that the parties used a term in a technical or unusual sense, contractual terms are given their plain, ordinary, and generally accepted meaning." *Id.* We will not attempt to rewrite a PMA by inserting a provision that the parties could have included or by imposing restraints for which they did not bargain. *Id.* at 124. And in interpreting the PMA, "we must examine and consider the entire writing in an effort to harmonize and give effect to all the

13

provisions of the contract so that none will be rendered meaningless." *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012).

### III.     Division of Community Property

In his first issue, Hank contends that the trial court abused its discretion by awarding Tina the $900,000 judgment because the PMA required that each party receive half of the community estate. Alternatively, he argues that there was no evidence to support an implied finding of reimbursement or constructive fraud on the community. Tina responds that the PMA did not preclude a finding of constructive fraud and that the trial court did not abuse its discretion by reconstituting the martial estate based on its implied finding that Hank committed fraud.

#### A.     Whether the trial court had discretion to make a just and right division of the community estate

Section 7.001 of the Texas Family Code requires that a trial court must "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." Tex. Fam. Code § 7.001. "Trial courts can only divide community property, and the phrase 'estate of the parties' encompasses the community property of a marriage, but does not reach separate property." *Pearson v. Fillingim*, 332 S.W.3d 361, 363 (Tex. 2011) (per curiam). The division must be equitable but need not be equal. *See Schlueter v. Schlueter*, 975 S.W.2d 584, 588 (Tex. 1998).

Hank and Tina disagree about the applicability of section 7.001, and by extension the cognizability of equitable claims of reimbursement and constructive fraud, in light of their PMA. This question—whether a trial court that finds a PMA to be valid and enforceable has discretion to deviate in any way from the agreement's provisions regarding the division of the community estate—appears to be an issue of first impression in this Court.

14

The parties have provided, and we have found, little authority discussing the interplay between section 7.001 and Texas's version of the Uniform Premarital Agreement Act (UPAA). We previously discussed the UPAA in *Sheshunoff*, a case involving a partition-or-exchange agreement. 172 S.W.3d at 693. We explained that subsections 4.006(a) and (b) of the Family Code reflected the view that "a premarital agreement that was voluntarily executed would be enforced, even if unconscionable, as long as the opposing party knew or should have known of the other party's assets, or waived such disclosure." *Id.* (citing *In re Marriage of Bonds*, 5 P.3d 815, 825 (Cal. 2000)). In adopting the UPAA, Texas abandoned its previous requirement that a party seeking to enforce a PMA prove by clear and convincing evidence that the agreement was not procured by fraud, duress, or overreaching; the shifted burden reflected the Legislature's "strong policy preference that marital property agreements should be enforced whenever persons who are married or intend to marry voluntarily enter into them." *Id.* at 694.

There is persuasive caselaw suggesting that a valid and enforceable PMA renders the requirement of a "just and right" division of the community estate inapplicable. In a case in which the Texas Supreme Court recently upheld a trial court's grant of summary judgment on a declaratory-judgment claim concerning the interpretation of a PMA, the supreme court analyzed in dicta what effect the wife's attempted recission of the PMA would have had if it had succeeded:

> By seeking to rescind the Agreement, [Wife] sought what could have been a greater distribution of the marital estate under the Texas Family Code and related Texas common law than she would have received had the Agreement remained in place . . . . Had [Wife] succeeded in rescinding the Agreement, her payments would instead have been determined by the Texas Family Code's provisions for a just and right division of the community property. This manner of property division would have been "at variance with" several provisions of the Agreement . . . . and with the Agreement's overall design to substitute certain payment amounts for the default legal rules of marital property division. *See generally* Tex. Fam. Code §§ 3.001–.410 (regarding marital property rights and liabilities).

15

*Marriage of I.C. & Q.C.*, 551 S.W.3d at 122.

The supreme court, emphasizing that defenses to enforcement of a PMA are statutorily limited to involuntariness and unconscionability, rejected the wife's request for a just-cause or good-faith exception to the PMA, reasoning that recognizing such exceptions "would both judicially expand section 4.006 and run afoul of [the court's] longstanding preference to protect the freedom of contract by enforcing contracts as written." *Id.* at 124. The court declared that "Texas law disfavors equitable exceptions to the enforcement of contracts as written." *Id.* Previously, the court has explained that it adheres "to the maxim that 'equity follows the law,' which requires equitable doctrines to conform to contractual and statutory mandates, not the other way around." *Fortis Benefits v. Cantu*, 234 S.W.3d 642, 648 (Tex. 2007). "Where a valid contract prescribes particular remedies or imposes particular obligations, equity generally must yield unless the contract violates positive law or offends public policy." *Id.* at 648–49. In a concurrence to *Marriage of I.C. & Q.C.*, Justice Lerhmann similarly posited that because rescission is "'an equitable remedy that extinguishes legally valid contracts that must be set aside because of fraud, mistake, or other reasons in order to avoid unjust enrichment,'" section 4.006 arguably "forecloses rescission as a remedy altogether with respect to premarital agreements." *Marriage of I.C. & Q.C.*, 551 S.W.3d at 125–26 (Lehrmann, J., concurring) (quoting *Cantu v. Guerra & Moore, Ltd.*, 328 S.W.3d 1, 8 (Tex. App.—San Antonio 2009, no pet.)).

Another case, *Fanning v. Fanning*, involved both a PMA and a claim of constructive fraud on the community. 847 S.W.2d 225, 226 (Tex. 1993) (per curiam) (*Fanning II*). The court of appeals determined that because the trial court did not find the PMA was executed involuntarily or was unenforceable, the trial court had erred by setting the agreement aside. *Fanning v. Fanning*, 828 S.W.2d 135, 143 (Tex. App.—Waco 1992), *aff'd in part, rev'd in part*,

16

847 S.W.2d 225 (*Fanning* I). Important for our purposes was the court of appeals' conclusion that the trial court had also erred by failing to equally divide the community estate in accordance with the PMA:

> An agreement to equally divide community property also appears to encroach upon the trial court's statutory duty to "order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party[.]" *See* Tex. Fam. Code § 3.63(a).[7] However, because section 5.41 had more clearly defined "the rights of the parties," the trial court, according to section 3.63(a), must give "due regard" to the terms of a premarital agreement authorized by the constitution. *See* Tex. Const. art. XVI, § 15; Tex. Fam. Code § 3.63(a). Therefore, the court erred to the extent that it failed to equally divide any community property of the parties.

*Fanning* I, 828 S.W.2d at 143. Despite acknowledging the binding nature of the PMA's terms, the court of appeals held that there was sufficient evidence to support the trial court's finding that the husband had committed constructive fraud but determined that the trial court had awarded excessive damages; the court of appeals remanded for the trial court to determine "the amount of community funds disposed of unfairly by" the husband. *Id.* at 149.

At the supreme court, the wife challenged the PMA's validity, claiming that it was executed under duress and was unconscionable. *Fanning* II, 847 S.W.2d at 226. The supreme court determined that the court of appeals had too narrowly confined the issues on remand:

> The trial court should not, in the interest of justice, be required to enforce the premarital agreement but should have the opportunity to reconsider [Wife]'s other challenges to its enforceability. [Wife]'s failure to request, and the trial court's failure to make, findings regarding duress and unconscionability may well have been premised on the reasoning that those claims need not be addressed if the

---

[7] Section 3.63 was the statutory predecessor to section 7.001. Section 5.41, in effect before Texas adopted the UPAA, provided, "Before marriage, persons intending to marry may enter into a marital property agreement as they may desire." *Fanning v. Fanning*, 828 S.W.2d 135, 143 (Tex. App.—Waco 1992), *aff'd in part, rev'd in part on other grounds*, 847 S.W.2d 225 (Tex. 1993) (per curiam).

17

agreement was unconstitutional . . . . It may be necessary for the trial court to redetermine the property division regardless of the enforceability of the premarital agreement, but it need not redetermine damages unless the agreement is found to be enforceable. If the damages [Wife] claims for breach of fiduciary duty are unliquidated and a retrial to determine those damages is necessary, [Husband]'s liability for alleged breaches must also be retried as long as that liability is contested.

*Id.* One of our sister courts has understood the supreme court's language regarding possible redeterminations to mean "that if, upon retrial, the trial court determined the premarital agreement was *not enforceable*, it would be necessary for it to redetermine the amount of community property, if any, which was, in fact, fraudulently transferred." *In re Marriage of Moore*, 890 S.W.2d 821, 829 (Tex. App.—Amarillo 1994, no writ) (emphasis added).

In a third case, one of our sister courts has followed the shared rationale of *Fanning I* and *II* and *Marriage of I.C. & Q.C.* in reasoning that section 7.001 and equitable remedies do not apply in divorces subject to a PMA. *See Bufkin v. Bufkin*, 259 S.W.3d 343, 353 (Tex. App.—Dallas 2008, pet. denied). The husband in *Bufkin* argued that the trial court erred by excluding evidence of fault, and the Dallas court of appeals disagreed, citing section 7.001 and declaring that

[s]ince [Husband and Wife] have contracted how the community estate was to be divided in the event of divorce, provisions of the Texas Family Code allowing evidence of fault in divisions do not apply. The Agreement's terms dictated an even division of the community estate. Accordingly, evidence of fault is not relevant and the trial judge did not abuse her discretion when she excluded it.

*Id.*; *but cf. Rathjen v. Rathjen*, No. 05-93-00846-CV, 1995 WL 379322, at *7 (Tex. App.—Dallas May 30, 1995, writ denied) (noting that husband had not challenged trial court's findings that he "engaged in unfair and fraudulent conduct that dissipated [wife]'s interest in the community estate" and stating that "[s]uch findings may ultimately affect the final division of property between the

18

parties, but they do not render the PMA unconscionable at the time it was executed" (citing *Fanning* II, 847 S.W.2d at 226)).

Because we agree with the supreme court and our sister courts that section 7.001 does not apply when a valid and enforceable PMA provides for a particular division of the community estate, we hold that the trial court was without authority to make a just and right division of Hank and Tina's community estate but instead was required to divide the community estate based on the PMA's directive that each party receive "one-half of all community assets, less community debt." *See Marriage of I.C. & Q.C.*, 551 S.W.3d at 122, 124–26; *Cantu*, 234 S.W.3d at 648–49; *Fanning* II, 847 S.W.2d at 226; *Bufkin*, 259 S.W.3d at 353; *Fanning* I, 828 S.W.2d at 143. Our holding is consistent with Texas's strong preference for the enforcement of contracts, including PMAs, as well as its disfavor toward allowing equitable exceptions to contracts into which parties freely and voluntarily entered. *See Marriage of I.C. & Q.C.*, 551 S.W.3d at 122, 124–26; *Cantu*, 234 S.W.3d at 648–49. Consequently, the trial court's award of the $900,000 judgment to Tina was an abuse of discretion insomuch as it was intended to achieve a just and right division of the community estate contrary to the PMA's terms. *See Transcor*, 650 S.W.3d at 482; *Murff*, 615 S.W.2d at 698.

**B.      Whether there was evidence to support an implied finding of reimbursement**

Alternatively, even if the trial court intended the $900,000 as a reimbursement judgment, there was no evidence in the record to support an implied finding that the community was entitled to $900,000 in reimbursement.

Under Texas law, there are three "marital estates":  the separate estates of each spouse and the community estate, consisting of "the community property owned by the spouses

19

together." Tex. Fam. Code § 3.401. A reimbursement claim exists when one or both spouses use the property of one marital estate to confer on a different marital estate a benefit which, if not repaid, would result in unjust enrichment to the benefitted estate. *See id.* § 3.402(a); *see, e.g.*, *McCartney v. McCartney*, 720 S.W.3d 789, 798 (Tex. App.—Houston [14th Dist.] 2025, no pet.) ("[A] community marital estate is entitled to reimbursement for community property funds used to enhance the separate property of one of the spouses."). Reimbursable claims include (1) payment of a debt, liability, or expense; (2) improvements on real property; and (3) use of a spouse's time, toil, or talent. *See* Tex. Fam. Code § 3.402(c).

Parties to a PMA are entitled, as was done here, to contract with regard to possible reimbursement claims, including by waiving them wholly or in part. *See id.* § 3.410; *see also Jimenez v. Jimenez*, No. 01-23-00087-CV, 2025 WL 1160683, at *7 n.13 (Tex. App.—Houston [1st Dist.] Apr. 22, 2025, pet. denied) (mem. op.) (recognizing that PMA can waive reimbursement claims); *Moroch v. Collins*, 174 S.W.3d 849, 859 (Tex. App.—Dallas 2005, pet. denied) (holding that interspousal agreement waived husband's and wife's claims for reimbursement against each other's separate estates but not claims against community). The PMA in this case waived reimbursements between Hank and Tina's separate estates but allowed reimbursement claims for payments or contributions made to one of their separate estates by the community estate.

The divorce decree is silent as to Tina's reimbursement claim. As noted above, the trial court did not issue any findings of fact and conclusions of law, and we must therefore presume that it made all findings necessary to support its $900,000 judgment. *See Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 135 (Tex. 2017) (per curiam).

There is no evidence in the record that community property was used to benefit Hank's separate estate; to the contrary, Tina argued at trial that the PMA intentionally minimized

20

the community estate, leaving her—and the couple's lavish lifestyle—dependent on Hank's willingness to use his separate funds. In essence, she argued that had she known that when they divorced, little would remain in the community estate, she would have used community property over the course of the marriage to provide for her retirement and not toward travel or leisure. Any reimbursement claim, in other words, would be for community property used to benefit the community estate. Although we construe PMAs narrowly in favor of the community estate, *Fischer-Stoker*, 174 S.W.3d at 278–79, such intra-estate reimbursement claims are allowed neither by the Family Code nor by Hank and Tina's PMA, *see* Tex. Fam. Code § 3.402(a) (requiring benefit to "*another* marital estate") (emphasis added); *Alsenz v. Alsenz*, 101 S.W.3d 648, 655 (Tex. App.—Houston [1st Dist.] 2003, pet. denied) ("Permissible reimbursement may run from community estate to separate estate, from separate estate to community estate, and from separate estate to separate estate."). Further, there is no evidence of a reimbursement claim for community property used to benefit Hank's separate estate because the PMA defines community property as funds deposited in the parties' joint accounts. Though the PMA required the parties to deposit their salaries into joint accounts, it defined Hank's salary as the lesser of "$60,000 per year" or "1/2 of the profits of Accurate, Inc." There is no evidence that Hank failed to do so. And the PMA defined additional income as Hank's separate property, such that any of Hank's "time, toil, or talent" spent on his separate property businesses that resulted in more than this upper-limit contribution cannot form the basis of a reimbursement claim.

Because there was no evidence that community property was used to benefit Hank's separate estate, the trial court would have abused its discretion by impliedly finding that the community estate was entitled to a $900,000 reimbursement judgment, much less that the full

judgment should be awarded to Tina. *See Bos*, 556 S.W.3d at 299–300; *Robbins*, 584 S.W.3d at 473.

### C. Whether there was evidence to support an implied finding of constructive fraud on the community

Again in the alternative, if the trial court intended the $900,000 instead as an award to remedy Hank's purported constructive fraud on the community, there was no evidence in the record to support an implied finding that constructive fraud in fact occurred.

"Fraud on the community" is a "judicially created concept based on the theory of constructive fraud," which involves the "breach of a legal or equitable duty which violates the fiduciary relationship existing between spouses." *Osuna v. Quintana*, 993 S.W.2d 201, 207 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.); *see Archer v. Griffith*, 390 S.W.2d 735, 740 (Tex. 1964) ("Actual fraud usually involves dishonesty of purpose or intent to deceive, whereas constructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests."). Constructive fraud claims are sometimes referred to as claims for breach of fiduciary duty or as waste. *Wadhwa v. Wadhwa*, 720 S.W.3d 169, 186 (Tex. App.—Houston [14th Dist.] 2025, no pet.); *cf. In re Marriage of Walzel*, No. 14-16-00637-CV, 2018 WL 614767, at *3 (Tex. App.—Houston [14th Dist.] Jan. 30, 2018, no pet.) (mem. op.) ("Waste is one form of fraud on the community.").

Constructive fraud occurs when one spouse deprives the community of assets to the detriment of the other spouse. *Schlueter*, 975 S.W.2d at 589. "A fiduciary duty exists between a husband and a wife as to the community property controlled by each spouse." *Zieba v. Martin*, 928 S.W.2d 782, 789 (Tex. App.—Houston [14th Dist.] 1996, no writ). Absent fraud on the rights

22

of the other spouse, a spouse has the right to control and dispose of community property subject to his sole management. *Massey v. Massey*, 807 S.W.2d 391, 401 (Tex. App.—Houston [1st Dist.] 1991, writ denied). Constructive fraud does not, however, require an intent to deceive. *Wadhwa*, 720 S.W.3d at 186 (citing *Puntarelli v. Peterson*, 405 S.W.3d 131, 138 (Tex. App.—Houston [1st Dist.] 2013, no pet.)). "Instead, a presumption of constructive fraud arises when a claimant spouse shows that the other spouse has disposed of community property without the claimant spouse's knowledge or consent." *Id.* The lack of either knowledge or consent is sufficient; the presumption "may arise even when the other spouse has knowledge of the disposition, so long as she did not also consent to the disposition." *Everitt v. Everitt*, No. 01–11–00031–CV, 2012 WL 3776343, at *3 (Tex. App.—Houston [1st Dist.] Aug. 31, 2012, no pet.) (mem. op.). "Once the presumption arises, the burden of proof shifts to the disposing spouse to rebut the presumption by showing that the disposal was fair." *Wadhwa*, 720 S.W.3d at 186. Courts consider several factors to decide if a disposition of community property constitutes constructive fraud: (1) the size of the gift in relation to the total size of the community estate, (2) the adequacy of the estate remaining to support the wronged spouse, (3) the relationship between the disposing spouse and the recipient of the gift, and (4) whether special circumstances existed to justify the gift. *Barnett v. Barnett*, 67 S.W.3d 107, 126 (Tex. 2001); *Dyer v. Dyer*, No. 03-16-00753-CV, 2018 WL 2994439, at *6 (Tex. App.—Austin June 15, 2018, no pet.) (mem. op.).

There was no evidence from which the trial court could have found that Tina met her burden of proving that community property was transferred outside of the community. *See In re Marriage of DeVine*, 869 S.W.2d 415, 423 n.11 (Tex. App.—Amarillo 1993, writ denied) ("Although the burden of proof to show the fairness of a transfer is upon the spouse responsible for the transfer, it is the burden of the complaining spouse to show that there was a transfer of

23

community property in the first place."). The evidence showed that Hank disposed of community funds to benefit the community in the form of a lavish lifestyle, international travel on private jets, and expensive equestrian sports. By contrast, there was no evidence that he used his required $60,000 yearly salary under the PMA for the benefit of his separate estate, including Accurate, or to benefit a third party. As with Tina's reimbursement claim, the crux of her argument is that she now regrets how the community funds were used and would have preferred that some portion be set aside to provide for her in case of divorce.

Because there is no evidence that Hank transferred community property to third parties, made excessive gifts to third parties, or used community property to benefit his separate estate, the evidence is legally insufficient to support an implied finding that he committed constructive fraud, and the trial court would have abused its discretion by awarding the $900,000 judgment on that basis. *See Transcor*, 650 S.W.3d at 482; *Bos*, 556 S.W.3d at 299–300; *Murff*, 615 S.W.2d at 698; *see also In re Marriage of Notash*, 118 S.W.3d 868, 873 (Tex. App.—Texarkana 2003, no pet.) (concluding that evidence of constructive fraud was legally insufficient where husband sent only occasional small cash payments to wife and their children but did not improperly dispose of community property).

Having concluded that under the PMA, the trial court had no discretion to make a just and right division of the community estate and that, alternatively, the court would have abused its discretion by awarding the $900,000 judgment based on an implied finding of reimbursement or constructive fraud on the community, we sustain Hank's first issue.

24

## IV.    Spousal Maintenance

In his second issue, Hank contends that the trial court abused its discretion by awarding Tina $5,000 per month in spousal maintenance for a period of ten years because (1) she possessed sufficient property to provide for her minimum reasonable needs, (2) she failed to exercise diligence in obtaining training or employment, and (3) the trial court improperly delayed signing the final divorce decree to allow her an additional $180,000 in maintenance. Tina responds that the court's award was not an abuse of discretion.

A spouse's eligibility for spousal maintenance is determined under Section 8.051, which provides, in relevant part, that

> the court may order maintenance for either spouse only if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs and . . . the spouse seeking maintenance . . . has been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs[.]

Tex. Fam. Code § 8.051(2)(B).

A spouse qualifying for maintenance under subsection 8.051(2)(B) must also rebut the presumption that maintenance is not warranted "unless the spouse seeking maintenance has exercised diligence in . . . earning sufficient income to provide for the spouse's minimum reasonable needs" or in "developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for the dissolution of the marriage is pending." *Id.* § 8.053(a). "Once a court determines that a spouse is eligible for maintenance under Section 8.051, it applies the factors set forth in Section 8.052 to determine the 'nature, amount, duration, and manner of periodic payments.'" *Mehta v. Mehta*, 716 S.W.3d 126, 132 (Tex. 2025) (quoting Tex. Fam. Code § 8.052).

25

The purpose of spousal maintenance is "'to provide temporary and rehabilitative support for a spouse whose ability to support herself has eroded over time while engaged in homemaking activities and whose capital assets are insufficient to provide support.'" *Id.* at 133 (quoting *Sherman v. Sherman*, 650 S.W.3d 897, 899 (Tex. App.—Fort Worth 2022, no pet.)). The Family Code does not define "minimum reasonable needs," and trial courts "generally have discretion to determine these needs on a case-by-case, fact-specific basis." *Id.* at 132. Although the best practice is for a spouse seeking support to offer into evidence an itemized list of monthly income and expenses, neither the Family Code nor the supreme court requires "exactitude." *Id.* However, a trial court must be careful not to double-count an asset or liability. *Id.* at 134.

"[C]ourts of appeals have repeatedly held that 'the law does not require the spouse to spend down long-term assets, liquidate all available assets, or incur new debt simply to obtain job skills and meet short-term needs.'" *Id.* at 132 (quoting *Schafman v. Schafman*, No. 01-20-00231-CV, 2022 WL 962466, at *6 (Tex. App.—Houston [1st Dist.] Mar. 31, 2022, no pet.) (mem. op.)).

Section 8.055 of the Family Code caps the amount of spousal maintenance at the lesser of $5,000 or twenty percent of the contributing spouse's gross monthly income. Tex. Fam. Code § 8.055(a). Neither Hank nor Tina contests the trial court's determination that $5,000 was the lesser of the two amounts in this case. Section 8.054 provides, in relevant part, that a trial court may not order maintenance that remains in effect for more than seven years after the date of the order, if the spouses were married to each other "for at least 20 years but not more than 30 years," or for more than ten years after the date of the order, if they were married "for 30 years or more." *Id.* § 8.054(a)(1). Absent certain inapplicable exceptions, the court must "limit the duration of a

maintenance order to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs." *Id.* § 8.054(a)(2).

A.    **Whether Tina possessed sufficient property to provide for her minimum reasonable needs**

First, we consider whether legally sufficient evidence in the record demonstrates that Tina "will lack sufficient property, including [her] separate property, on dissolution of the marriage to provide for "her minimum reasonable needs" such that she is eligible for spousal maintenance. *See id.* § 8.051. Tina followed the "best practice" set forth in *Mehta*, and the trial court admitted her itemized list of income and expenses. *See Mehta*, 716 S.W.3d at 135. Her budget reflected zero income and expenses of approximately $10,500 per month. Notably, she appears to have significantly underestimated her expenses, which do not include the cost of rent, utilities, homeowner's or renter's insurance, health and dental insurance, car insurance, or the cost of caring for her horses.[8] She testified that a health-insurance plan would cost around $1,200 to $2,200 per month. She likewise omitted the cost of furniture, which is significant given Hank's testimony that Accurate owned the furniture used to furnish the couple's properties.

While Hank asserts that the budget was unreasonable, the trial court was responsible for evaluating the credibility of witnesses and resolving any conflicts in the evidence, and we will not second-guess its determinations. *See In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 390 (Tex. App.—Dallas 2013, no pet.) (we "will not disturb a trial court's resolution of conflicting evidence that turns on the credibility or weight of the evidence"); *see also*

---

[8] Next to many of the listed items, including "Pets and livestock," Tina wrote, "Husband pays." She accounted, however, for $600 per month for a farrier, a craftsman who trims and shoes horses' hooves.

*Murff*, 615 S.W.2d at 700. The budget constituted probative evidence of Tina's income and expenses, and we are bound by the trial court's implied finding concerning its accuracy despite any evidence to the contrary. *See Wheeling v. Wheeling*, 546 S.W.3d 216, 226–27 (Tex. App.—El Paso 2017, no pet.) ("Where there is probative evidence to support the findings, they are binding on the reviewing court even if there is conflicting evidence suggesting different conclusions.").

The evidence showed that at the time of trial, Tina was fifty-eight years old and had not worked regularly, if at all, in almost thirty years aside from raising her children. Although she had broached with Hank the topic of her returning to work, he consistently rejected the idea. Despite the couple's enjoyment of luxuries during their marriage, Tina was left in a precarious financial position after the divorce. She lived in a small apartment on her parent's property, had no job, and testified that she had no means of supporting herself or of meeting her minimum reasonable needs. She owned no real property and lacked both a retirement account and life-insurance policy. Under the divorce decree, she was awarded separate property including the joint bank accounts in her name, which totaled around $14,675.16 after accounting for her credit card debt, and half of one of Accurate's bank accounts—an award of $8,914.84.[9] The trial court also awarded her a UBS Wealth Management account, ending in x9089, that was purportedly in her name. However, there was evidence of only one UBS account at trial—the traditional IRA account ending in x9090, which was in Hank's name and was awarded to him as his separate property. Although Hank testified that he had created an identical account for Tina, she testified that she was unaware of it, and no evidence of its existence was admitted other than Hank's

---

[9] Hank does not challenge this award on appeal.

28

testimony.[10]   In addition to its separate-property awards, the trial court confirmed as Tina's separate property:  diamond jewelry, two horses, "SWA Profit Sharing/Stocks,"[11] a Freightliner truck, a 2020 Ford F-250, the Porsche, and two trailers.

Much of Hank's argument on appeal concerns the trial court's $900,000 judgment, which having reversed, we will not consider to be included among Tina's assets.  He also argues that we should consider the $4,924.04 per month in temporary spousal support that she received from August 2021 until June 2023, when it increased to $6,424 per month.  However, the temporary spousal support was just that, temporary.  It was designed to meet Tina's needs during the pendency of the divorce proceedings and, even then, was enough to meet only half of her monthly expenses.  There was no evidence at trial that any portion of the temporary support was converted into a more durable investment or asset, and we will not make that assumption.

Based on the evidence presented and using the appropriate standards, we conclude that the trial court's determination that Tina was eligible for spousal maintenance rises to a level that would enable reasonable and fair-minded people to differ in their conclusions; thus, the eligibility decision did not constitute an abuse of the trial court's discretion.  *See Harwood v. Harwood*, --- S.W.3d ---, ---, No. 03-23-00455-CV, 2025 WL 2233982, at *7 (Tex. App.—Austin Aug. 6, 2025, no pet.); *see also Amos v. Amos*, 79 S.W.3d 747, 750 (Tex. App.—Corpus Christi–Edinburg 2002, no pet.) ("Based on this evidence we hold that the trial court could properly

---

[10]  On Hank's marital property spreadsheet, he listed both UBS IRA accounts.  Yet only his had an account number, ending x9090.

[11]  Presumably, this refers to equity in Southwest Airlines, for which Tina worked as a flight attendant.  An identical item was listed as her separate property on a schedule attached to the PMA.  The asset was not mentioned at trial and appears on neither Hank's nor Tina's property inventories.  If it exists, its value is unclear.

determine the appellee's reasonable minimum needs. Accordingly, we hold that the trial court did not abuse its discretion in awarding spousal maintenance[.]").

**B.      Whether Tina rebutted the presumption that maintenance was unnecessary**

Having determined that Tina lacks sufficient property upon divorce so as to be eligible for maintenance, we next turn to whether she is entitled to maintenance under subsection 8.051(2)(B), reserved for a spouse seeking maintenance who has "been married to the other spouse for 10 years or longer and lacks the ability to earn sufficient income to provide for the spouse's minimum reasonable needs." Tex. Fam. Code § 8.051(2)(B). As noted above, and as relevant under the circumstances of this case, there is a rebuttable presumption that spousal maintenance is not warranted under subsection 8.051(2)(B) unless the spouse has been diligent in developing the necessary skills to provide for her minimum reasonable needs during a period of separation and while the divorce suit is pending. *See id.* § 8.053. The statute "sets forth the conditions under which a rebuttable presumption arises" but does not "define or circumscribe what type of evidence is required to overcome that presumption." *Marin v. Marin*, No. 03-22-00013-CV, 2023 WL 2776296, at *4 n.5 (Tex. App.—Austin Apr. 5, 2023, no pet.) (mem. op.).

At fifty-eight, Tina was already near the retirement age for a flight attendant, which she had not been in almost thirty years. Nevertheless, since her and Hank's separation, she had applied for jobs at several airlines and other businesses, including Netflix and MGM, which had openings for "corporate flight attendants." Despite participating in "two or three interviews on each of one of them," she "did not get the job." She received only one offer, but the required relocation would not have allowed her to see her children, and the pay was so low that "[i]t would have cost [her] actually to work for this airline." In addition to applying for jobs as a flight

30

attendant, she began studying for a real estate license while the divorce was pending. However, she had not finished her classes by the time of trial and had been told that even after becoming a real estate agent, it would take a while before she could support herself.

Although Hank argues in his brief that Tina failed to prove diligence because she did not "seek employment in the horse[-trading] industry, an area where she had extensive experience during the marriage," we find his argument unconvincing. He has offered no authority for the proposition that a spouse must pursue a job in a certain industry or area of expertise to rebut the presumption under section 8.053. And it would be reasonable to infer that horse-trading requires a great deal of capital, including land, horses, feed, veterinary care, and travel. While Tina may have had access to such things during the marriage, there was no evidence that she could engage in the business at scale after her divorce. As noted above, she currently lives in an apartment on her parent's property and owns only two horses and two trailers.

This evidence was legally sufficient to support a finding that Tina exercised diligence in developing the necessary skills to provide for her minimum reasonable needs. *See Slicker v. Slicker*, 464 S.W.3d 850, 863 (Tex. App.—Dallas 2015, no pet.) (reasonable diligence demonstrated by spouse who conducted job search, took one computer class and planned to take another, had sent resume to one potential employer, and had worked for short period of time); *cf. Cannon-Hunter v. Hunter*, No. 03-21-00332-CV, 2023 WL 2025708, at *4 (Tex. App.—Austin Feb. 16, 2023) (mem. op.) (reasoning that trial court could have concluded that wife "had made very little effort to develop skills to provide for her needs" because she "testified about a real estate course and test that she had not passed, but she admitted that she had not done anything to complete the course" in over one year); *Coleman v. Coleman*, No. 02-09-00155-CV, 2009 WL 4755173, at *3 (Tex. App.—Fort Worth Dec. 10, 2009, no pet.) (mem. op.) (concluding that there was

31

insufficient evidence to support spousal-maintenance award when spouse's only testimony was that she "looked into" getting job and that she made $500 in previous two years).

Alternatively, even if the evidence were legally insufficient, "the lack of such evidence simply gives rise to a rebuttable presumption that spousal maintenance is not warranted" and shifts the burden to the spouse seeking support to produce evidence that contradicts the presumption. Once that burden is discharged and evidence contradicting the presumption has been offered, the presumption disappears and "is not to be weighed or treated as evidence." *General Motors Corp. v. Saenz*, 873 S.W.2d 353, 359 (Tex. 1993) (quoting *Combined Am. Ins. v. Blanton*, 353 S.W.2d 847, 849 (Tex. 1962)). We have explained that in reviewing whether a spouse seeking support has offered evidence contradicting the presumption, our review "is informed by the legislative purpose in enacting provisions for spousal maintenance." *Marin*, 2023 WL 2776296, at *4 (citing *O'Carolan v. Hopper*, 71 S.W.3d 529, 533 (Tex. App.—Austin 2002, no pet.)).

There was evidence at trial that while Tina was caring for her and Hank's children, he was able to grow Accurate into a successful business. By contrast, she testified that as of the time of trial, she had no way of supporting herself or of meeting her minimum reasonable needs. From this evidence, as well as the evidence of Tina's age, lack of capital, time out of the job market, limited education, and uncertain earning capacity, the trial court could have determined that she overcame the section 8.053 presumption if it arose. *See id.* (concluding that wife offered adequate evidence to overcome presumption given her "long absence from the work force due to her homemaking activities, her inability to secure employment that would cover her household expenses without additional education or certifications, and her inability to provide for her minimum reasonable needs"). Accordingly, we conclude that the trial court did not abuse its

32

discretion by awarding Tina spousal maintenance. *See Transcor*, 650 S.W.3d at 482; *Murff*, 615 S.W.2d at 698; *Marin*, 2023 WL 2776296, at *4.

C.    **Whether the trial court could award spousal maintenance for a period of ten years**

Finally, we consider the duration of Tina's spousal maintenance award. Hank argues that the trial court abused its discretion by awarding Tina ten years of spousal maintenance because rather than sign the final divorce decree on the date of trial, November 20, 2023, when Hank and Tina had been married for twenty-nine years, the court waited until February 2, 2024—when they had been married for thirty years—to grant the divorce, thereby extending the permissible duration of its maintenance award under section 8.054. *See* Tex. Fam. Code § 8.054(a)(1). He asserts that the court's decision "shows the arbitrary nature of the failure to render judgment; it was done purely to benefit Tina and had no basis in law." Although he recognizes that "there is little guidance on whether a trial court has the ability to delay rendering a divorce to extend the allowable duration of maintenance under the [Family] Code," he suggests that we should be guided by our sister court's decision in *Hipolito v. Hipolito*, 200 S.W.3d 805, 806 (Tex. App.—Dallas 2006, pet. denied).

To the extent that our resolution of this question requires statutory construction, we employ a de novo standard of review and attempt to ascertain the Legislature's intent. *Tanner v. Texas State Univ.*, 722 S.W.3d 156, 162 (Tex. App.—Austin 2025, pet. filed) (citing *Texas Adjutant Gen.'s Office v. Ngakoue*, 408 S.W.3d 350, 354–55 (Tex. 2013); *First Am. Title Ins. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008)). To do so, we begin with the statute's plain language and, viewing it as a whole, endeavor to read it "contextually, giving effect to every word, clause, and sentence." *Ngakoue*, 408 S.W.3d at 354. "We apply the plain meaning of statutory language

33

unless (1) the Legislature has prescribed definitions, (2) the words have acquired a technical or particular meaning, (3) a contrary intention is apparent from the context, or (4) a plain-meaning construction leads to nonsensical or absurd results." *In re Texas Educ. Agency*, 619 S.W.3d 679, 687 (Tex. 2021) (orig. proceeding). We may also consider the "object sought to be obtained" by the statute and the "consequences of a particular construction." *Ngakoue*, 408 S.W.3d at 354.

Under section 8.054, the duration of a maintenance order is determined by the length of the marriage. It is uncontested that Hank and Tina were married on December 13, 1993. Their divorce became effective on February 2, 2024, when the trial court rendered its judgment, and not when the divorce was tried. *See Fletcher v. National Bank of Com.*, 825 S.W.2d 176, 179 (Tex. App.—Amarillo 1992, no writ) ("The divorce was effective upon the date of the signing of the decree rather than the date the cause came on to be heard."); *accord Underhill v. Underhill*, 614 S.W.2d 178, 181 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). Consequently, Hank and Tina had been married for over thirty years when their marriage was dissolved.

There is nothing in section 8.054, or the Family Code more broadly, expressly governing how long the trial court has after trying a divorce to render its judgment. Aside from the length of the marriage, the only factor limiting the trial court's discretion with regard to the duration of a maintenance order is subsection 8.054(a)(2), which requires the court to

> limit the duration of a maintenance order to the shortest reasonable period that allows the spouse seeking maintenance to earn sufficient income to provide for the spouse's minimum reasonable needs, unless the ability of the spouse to provide for the spouse's minimum reasonable needs is substantially or totally diminished because of:
>
> (A) physical or mental disability of the spouse seeking maintenance;
>
> (B) duties as the custodian of an infant or young child of the marriage; or

34

(C) another compelling impediment to earning sufficient income to provide for the spouse's minimum reasonable needs.

Tex. Fam. Code § 8.054(a)(2). Hank has not made an argument under subsection 8.054(a)(2) on appeal.

From section 8.054's language, it is clear the Legislature's primary concern was ensuring that a spouse receives maintenance until she has had a reasonable opportunity to rebuild her capacity to support herself and any children in light of the atrophy of her earning potential over the course of a marriage. *See Mehta*, 716 S.W.3d at 133. In other words, the maintenance should give her a fair chance "to ameliorate the 'very real hardships' that would otherwise exist as the result of a divorce." *Id.* (quoting *Dalton v. Dalton*, 551 S.W.3d 126, 143 (Tex. 2018) (Lehrmann, J., concurring)).

In light of section 8.054's language (and silence), we see no compelling justification to construe it as prohibiting maintenance for a certain duration if the threshold for that duration was met only because the trial court did not sign the divorce decree on the date of the trial. Had the Legislature intended to require the trial court to render judgment granting the divorce within a certain time of hearing it, the Legislature could have done so. This is not to say that a trial court may indefinitely delay rendering judgment; we conclude only that there is nothing in section 8.054 to compel Hank's understanding of the statute—that a trial court must render a final judgment immediately on the conclusion of trial—and he has offered us no other authority besides *Hipolito* in support of his preferred statutory construction.

Hank's reliance on *Hipolito* is not only misplaced; the decision, to the extent it can be understood as relevant to his argument, supports the trial court's award of spousal maintenance to Tina for a period of ten years. *Hipolito* concerned eligibility for spousal maintenance under

subsection 8.051(2) and not the duration of the maintenance under section 8.054. *See* 200 S.W.3d at 806. Subsection 8.051(2) permits maintenance, in relevant part, if "the duration of the marriage was ten years or longer." Tex. Fam. Code § 8.051(2). Alan Hipolito, who had been ordered to pay maintenance to his ex-wife Tracy, contended that subsection 8.051(2) "requires a couple to be married for at least ten years at the time the divorce action is filed or, alternatively, living together as husband and wife for at least ten years before a spouse becomes eligible for maintenance." *Hipolito*, 200 S.W.3d at 806. Specifically, he asserted that the ten-year period must be measured from the date of marriage to the filing of the divorce petition or the date when the spouses separated. *Id.* The court of appeals disagreed, noting that by its plain language, the statute "merely requires the marriage to be in existence for ten years or longer" and that Alan and Tracy's marriage "still existed at the time the petition for divorce was filed and when they stopped living together as man and wife." *Id.* at 807.

For the court of appeals, it was enough that by the time of the divorce trial, the couple had been married for ten years; for that reason, Tracy was eligible for spousal maintenance.[12] *Id.* However, the court's reasoning—that a marriage does not end when a spouse files for divorce or when spouses separate—applies equally to the date of trial, when Hank argues his marriage effectively ended for purposes of section 8.054. Spouses are still married during a divorce trial; a divorce does not become final until the trial court renders judgment. *See Baker v. Bizzle*, 687 S.W.3d 285, 292 (Tex. 2024). At the time the trial court rendered its judgment in this case, Hank and Tina had been married for thirty years, and she was therefore eligible for

---

[12] Significantly, because the court of appeals was concerned with Tracy's *eligibility* for spousal maintenance, it did not need to determine when her and Alan's marriage ended, only that it was still in existence at the time of trial, when they had been married for over ten years.

maintenance remaining in effect for up to ten years after the date of the order.[13]  *See* Tex. Fam. Code § 8.054(a)(1)(C).

For these reasons, we conclude that the trial court did not abuse its discretion by awarding Tina spousal maintenance for a period of ten years.  We overrule Hank's second issue.

## CONCLUSION

Having sustained Hank's first issue and overruled his second issue, we affirm in part and reverse in part the trial court's final divorce decree and remand this cause for a new division of Hank and Tina's community estate in accord with the terms of the parties' PMA.

_____

Maggie Ellis, Justice

Before Justices Theofanis, Crump, and Ellis

Affirmed in Part; Reversed and Remanded in Part

Filed:   March 19, 2026

Publish

---

[13]    Although the trial court wrote in its divorce decree that "final orders rendered on November 20, 2023, but divorce not granted until the date of the signing of this Final Decree of Divorce below [i.e., February 2, 2024]," a final judgment in a divorce case is rendered *when* the divorce is granted.  *See Araujo v. Araujo*, 493 S.W.3d 232, 236 (Tex. App.—San Antonio 2016, no pet.).  The fact that judgment was not rendered in this case until February 2, 2024, is further supported by the trial court's statement at the conclusion of trial, "The divorce will not be granted until the decree is signed."